486-07/PJG/EEL
FREEHILL HOGAN & MAHAR LLP
Attorneys for Plaintiffs
80 Pine Street
New York, NY 10005
(212) 425-1900
(212) 425-1901 fax
Peter J. Gutowski (PG 2200)
Gina Venezia (GV 1551)
Pamela L. Schultz (PS 8675)


UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

**07-CV- 9876 (DLC)**

NOVOSHIP (UK) LIMITED, CALLY SHIPHOLDINGS
INC., VITAL SHIPPING CORPORATION, and
DAINFORD NAVIGATION INC.,

                                    Plaintiffs,

            - against -


WILMER RUPERTI, SEA PIONEER SHIPPING
CORPORATION, and PMI TRADING INC., JOHN DOE
(fictitious) and JOHN DOE INC. (fictitious),

                                    Defendants.

-----------------------------------------------------------------x


### MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO VACATE RULE B ATTACHMENT, PRECLUDE FURTHER MARITIME ATTACHMENTS AND DISMISS

## TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ........................................................................................................ i

PRELIMINARY STATEMENT .................................................................................................. 1

PROCEDURAL HISTORY AND BACKGROUND FACTS ..................................................... 1

LEGAL ARGUMENT

POINT I

DEFENDANTS CANNOT BRING ON A MOTION TO DISMISS UNDER
THE GUISE OF A RULE E VACATUR APPLICATION.  THUS, THE
COURT'S REVIEW IS NOT CONSTRAINED TO AN ANALYSIS OF
JUST THE ALLEGATIONS IN THE VERIFIED COMPLAINT. ............................................ 5

POINT II

THE TEST FOR MARITIME TORT JURISDICTION IS MET IN THE
CONTEXT OF A FRAUD CLAIM RELATING TO THE CHARTER OF
OCEAN GOING VESSELS. ...................................................................................................... 7

    A.  Plaintiffs' Claims Satisfy The Nexus Requirement. ................................................. 9

    B.  Plaintiffs' Claims Similarly Satisfy The Location Requirement.. ........................... 10

    C.  A finding of admiralty jurisdiction would be consistent with
    recent Supreme Court pronouncements expanding maritime
    jurisdiction and the underlying policy of achieving uniformity in the
    maritime industry. ..................................................................................................... 16

POINT III

THERE IS AN ALTERNATIVE AND INDEPENDENT BASIS FOR
MARITIME JURISDICTION, BECAUSE THE CLAIMS INVOLVE
THE BREACH OF OBLIGATIONS UNDER MARITIME
CHARTER PARTY CONTRACTS ......................................................................................... 18

POINT IV

THE ORIGINAL COMPLAINT ADEQUATELY SETS FORTH DAMAGE ........................... 19

CONCLUSION ........................................................................................................................ 20

**PRELIMINARY STATEMENT**

Plaintiffs Novoship (UK) Limited ("Novoship"), Cally Shipholdings Inc. ("Cally"), Vital

Shipping Corporation ("Vital"), and Dainford Navigation Inc. ("Dainford") (collectively

"Plaintiffs"), submit this Memorandum of Law in opposition to Defendants' motion to vacate.

For the reasons set forth below, the motion should be denied in its entirety.

**PROCEDURAL HISTORY AND BACKGROUND FACTS**

On November 7, 2007, Plaintiffs filed a Verified Complaint against Defendants Wilmer

Ruperti ("Ruperti"), Sea Pioneer Shipping Corporation ("Sea Pioneer"), and PMI Trading Inc.

("PMI"), alleging admiralty claims grounded in contract and fraud associated with the long-term

time charters of Plaintiffs' ocean-going tankers. (*See, e.g.*, Verified Complaint at ¶10, 11, 15,

44-50). At the time of filing, Plaintiffs applied for and were granted an order of attachment

pursuant to Supplemental Admiralty Rule B seeking a restraint of Defendants' assets in the

amount $17,149,420.00. Process of Maritime Attachment ("PMAG") was issued and served on

a variety of banking institutions, but, to date, only a limited sum has been restrained

(approximately 18% of the amount stated in the PMAG).[1]

Defendants have filed a motion to vacate, grounded essentially on the argument that the

claims are not maritime and hence will not support admiralty jurisdiction or entitlement to an

attachment under Rule B. Defendants' motion is flawed, however, because they ignore the

fundamental maritime nature of the fraud, its clear impact on vessels trading on navigable

---

[1] Almost immediately upon initial service, transfers involving these Defendants were restrained. Notice
was then provided as per the Local Rules. Since that point in time, however, virtually no further restraints
have occurred. To the extent the vast majority of ocean transportation contracts designate payments in
U.S. dollars, which must clear through U.S. clearinghouse banks, it is presumed that Defendants are now
transferring their funds in the names of yet other shell entities controlled by Defendant Ruperti in an
effort to mask those transfers and circumvent the Court's order of attachment.

waters. Further they fail to consider the contractual aspects of these claims which involve charter party contracts, diversion of charter hire and fraudulent control of vessels at sea. Simply saying that the claims are land based does not make it so, nor does the effort to re-cast them in that light. There is no legitimate basis upon which this Court's exercise of admiralty jurisdiction over the subject claims should be limited.

Turning to the facts, and in broad outline, Plaintiffs' claims against Defendants involve both contractual and tort grounded theories of recovery arising out of multiple long-term time charters of Plaintiffs' tanker vessels – including the M/T MARSHAL CHUYKOV, M/T MOSCOW KREMLIN, and M/T MOSCOW STARS.[2] (Verified Complaint at ¶1, 10, 11, 15, 44-50.) The merits of the claims are now the subject of a London High Court litigation, and the captioned action was commenced as an adjunct to that litigation to obtain security and to ensure, as a consequence of the seizure of assets, the Defendants' meaningful participation. (Verified Complaint at ¶51-53). As such, this Court will not be called upon, nor do Defendants ask the Court, to reach any determination about the merits.

To the extent Defendants' challenge to the attachment focuses on the maritime nature of Plaintiffs' claims, however, some discussion of the facts is necessary to enable the Court to conduct its review. Plaintiffs therefore provide the following review of the facts which confirm the admiralty and maritime nature of the circumstances giving to Plaintiffs' claims.[3]

Briefly, through a fraudulent scheme orchestrated by Defendant Ruperti (acting on his own behalf and through his two shell corporations – Defendants Sea Pioneer and PMI) and

---

[2] Plaintiff Cally was the owner of the M/T MARSHAL CHUYKOV, Vital was the owner of the M/T MOSCOW KREMLIN and Dainford was the owner of the M/T MOSCOW STARS. Novoship acted as an agent and general manager for the owning companies and the vessels themselves. (Verified Complaint at ¶2-5.)

[3] The facts are further discussed in the accompanying Declaration of Vladimar Petromsho Oskirko and are also discussed within the argument section of this memorandum.

Vladimir Mikhaylyuk ("Mikhaylyuk"), a dishonest employee of Plaintiff Novoship, Plaintiffs' vessels were chartered, unbeknownst to them, to shell entities created by Ruperti. (Verified Complaint at ¶6, 16-19, 25-32, 37-38, 45, 48-50, and Oskirko Dec'l. at ¶6 and 12.) The purpose and effect of the scheme was to enable Defendants to gain control (as time charterers) of the trading capacity of these vessels, all the while leaving Novoship with the mistaken impression that the charter parties had in fact been effected directly with Petroleos de Venezuela S.A. ("PDVSA"). PDVSA is an agency of the Venezuelan government and a major charterer of oil carrying vessels in world-wide trade. (Verified Complaint at ¶13.)

To effectuate their subterfuge, Defendant Ruperti and Mikhaylyuk falsified the charter party documents so as to create a paper record at Novoship which reflected such direct charters between Plaintiffs Cally/Vital/Dainford, as owners, and PDVSA, as charterer (the "fake charters"). (Verified Complaint at ¶10-11, 15-28, 32-37, 44, 47.)  It was subsequently discovered, however, that no such direct contractual relationship existed. (Oskirko Dec'l. at ¶4.) Instead, the actual charterers were the Ruperti shell entities, - PMI and Sea Pioneer - who in turn had the direct contractual relationships with PDVSA (hereinafter the "secret" or "actual" charters). (Verified Complaint at ¶15, 19, 31, 38 and 47.)  Absent a contractual relationship with PDVSA, it was thus Ruperti and his two shell entities which had the time charter control over Plaintiffs' vessels and, equally important, the time charter obligations and duties owed to Plaintiffs under the terms of the time charter agreements. (Verified Complaint at ¶15, 19, 31, 38 and 47 and Oskirko Dec'l at 7-10.)  In their capacity as "secret" middle charterers, defendants positioned themselves to manipulating the charter rates in the fake charters, mask from Novoship the actual daily earnings of the vessels, and create a spread between what was being paid by PDVSA and what was being forwarded to Novoship so as to enable them to skim the difference

-- a difference which was sizable amounting to millions of dollars. (Verified Complaint at ¶15, 24, 36, 42-47).

Contrary to Defendants' suggestion, these transactions and fraudulent schemes had direct far effect beyond the shoreline, and beyond the initial conspiratorial exchanges. The direct effect of Defendants' actions was the creation of fake and secret charter parties which enabled them to gain total control of the operation, movement, and earnings of Plaintiffs' vessels under circumstances where they masked the true identity of the charterer. (Verified Complaint at ¶10-11, 15-16, 19, 21-27, 32, 37, 44 and 47; and Oskirko Dec'l. at ¶7-10) This control continued for years during the duration of the charters, as the Defendants skimmed the hire twice a month as it was being paid to them by PDVSA. The fraud continued throughout the entire period as it was the Defendants who issued the trading and sailing orders to Plaintiffs, and effectively controlled the vessels as they carried cargo, unbeknownst to Novoship. (Verified Complaint at ¶26.)

More importantly, the entire time the vessels were trading under the secret/actual charters, Defendants placed Plaintiffs at risk for a multitude of liabilities flowing from the fact that the time charterer's obligations and duties owed to Plaintiffs were the responsibility of the Ruperti and his shell entities, not the substantial oil giant PDVSA. (Oskirko Dec'l. at ¶6-12). In time charter transactions such as these, the charterer assumes significant aspects of the vessel's physical operation. The charterer is given essentially unfettered discretion to trade the vessel worldwide, and it selects the load and discharge ports, and hence the trading pattern of the vessel. (Oskirko Dec'l. at ¶9.) It bunkers the vessel. It is responsible for arranging tugs, pilots, etc. As a consequence, significant duties and liabilities attach to a time charterer under a time charter contract, and hence, the financial wherewithal of a potential charterer is of critical import

in a vessel owner's assessment of whether to enter into the contract with a particular entity. (Oskirko Dec'l. at ¶10-12.)

As outlined in the accompanying Declaration, had the true identity of the chartering entities been disclosed, Plaintiffs would have never entered into these charter transactions with the Ruperti shell entities and Defendants would have never obtained control of these vessels or had the opportunity to skim the vessels' daily earnings. (Oskirko Decl. at ¶6 and 12.) The fake charters and this fraudulent scheme had a continuing impact on the vessels' operations, earnings and movements throughout the life of the charter party contracts. (Verified Complaint at ¶15, 24, 36 and 42.) Defendants' effort to paint this transaction and fraud as being limited solely to land based activity bears no resemblance to the reality of the situation. If a claim involving fake charters, skimmed hire, and fraudulent control of vessels plying the high seas does not provide the Court with a viable case under admiralty jurisdiction, one would have to question when such jurisdiction would ever exist.

## LEGAL ARGUMENT

### POINT I

### DEFENDANTS CANNOT BRING ON A MOTION TO DISMISS UNDER THE GUISE OF A RULE E VACATUR APPLICATION. THUS, THE COURT'S REVIEW IS NOT CONSTRAINED TO AN ANALYSIS OF JUST THE ALLEGATIONS IN THE VERIFIED COMPLAINT

Defendants have filed a motion to vacate the attachment and dismiss the complaint. They seek this relief under Supplemental Rule E and its accelerated time provision calling for a substantive hearing in as little as three days notice. (*See* Defendant's letter application to the

Court dated December 7, 2007, citing Rule E(4)(f) and Local Rule E.1 as the basis for expedited treatment.)[4]

An application to vacate under Supplemental Rule E(4)(f) is a specialized maritime proceeding with the singular purpose of determining the on-going propriety of a maritime attachment under Supplemental Rule B. *Maersk, Inc. v. Neewra, Inc.,* 443 F.Supp.2d 519, 530 (S.D.N.Y. 2006). Such a proceeding is not the vehicle under which a motion to dismiss can be submitted, and a motion to vacate is not a motion to dismiss under Federal Rule of Civil Procedure 12(b). *Id.*

When a party seeks vacatur pursuant to a Rule E, the plaintiff bears the burden to show that the attachment should not be vacated, and the standard to be met is a reasonable grounds or probable cause standard. *Maersk,* 443 F.Supp.2d at 527. The court's review of whether reasonable grounds exist for the attachment is not limited to the adequacy of the allegations in the Complaint, but rather, the court may consider any manner of evidence offered in the parties' papers or at the post-attachment hearing, which can include documents, affidavits, declarations, or testimony. *Id.* (citing *Linea Naviera de Cabotaje, C.A. v. Mar Caribe de Navegacion, C.A.,* 169 F.Supp.2d 1341, 1348, 1357-58 (N.D. Fla. 2001)).[5]

Defendants' reliance on *Ronda Ship Mgmt. Inc. v. Doha Asian Games Organizing Comm.,* 511 F.Supp.2d 399 (S.D.N.Y. 2007), for the proposition that this Court's review should

---

[4]    A motion to dismiss would require, at a minimum, a ten business day period between filing and opposition. *See* Fed. R. Civ. P. 6(d) and Local Rule 6.1(b).

[5]    Even if the Defendants had properly moved for dismissal under Rule 12(b), which they have not, the Court would nevertheless be free to consider other evidence outside the complaint. *See e.g. Gonzales v. United States,* 284 F.3d 281, 287-88 (1st Cir. 2002) (court is free in Rule 12 context to examine documents referred to in the complaint); *Pegram v. Herdrich,* 530 U.S. 211, 229, n.10 (2000) (opponent in Rule 12 motion can clarify allegations of pleading in briefs). When considering a motion to dismiss for lack of subject matter jurisdiction, the court is not confined to the complaint, however. It may consider evidence outside the pleadings, such as affidavits. *See Antares Aiarcarft, L.P. v Federal Republic of Nigeria,* 948 F.2d 90, 96 (2d Cir. 1991), vacated on other grounds, 505 U.S. 1215 (1992).

be limited to the face of the complaint only, is misplaced. (*See* Defendants' Memorandum at 4,

n.3.) In *Ronda,* the defendant sought vacatur under several grounds, including an alleged failure

to state an admiralty claim. In support of this, it argued that it had never signed the charters. In

so doing, however, the defendant improperly couched a challenge to the *merits of the claim* as a

challenge to the adequacy of the pleading. The court declined to deal with the merits (i.e. Doha's

argument that it was not a party to the contract). With this out of the way, the court then quickly

dispatched Doha's challenge to the adequacy of the pleading by reviewing the complaint to see if

a contract claim was pled. The case does not stand for the proposition that in a vacatur

application dealing with a challenge to the court's jurisdiction, no other evidence can be

considered. Notably, Doha never challenged the proposition that a claim for a breach of charter

was maritime, but rather claimed it was not a party to a charter. In that scenario, all the court had

to do was look to see whether such a claim was pled in order to evaluate whether the pleading

standard discussed in the Second Circuit's decision in *Aqua Stoli Shipping Ltd. v. Gardner Smith

Pty. Ltd.,* 460 F.3d 434 (2d Cir. 2006) had been met.

## POINT II

### THE TEST FOR MARITIME TORT JURISDICTION IS MET IN THE CONTEXT OF A FRAUD CLAIM RELATING TO THE CHARTER OF OCEAN GOING VESSELS

Historically, jurisdiction over a maritime tort action was largely determined by

application of a "locality" test. *See, generally, Sisson v. Ruby*, 497 U.S. 358, 360 (1990) (citing

*The Plymouth*, 70 U.S. 20 (1866)). Under this test, the primary focus was whether the tort

occurred on navigable waters. In *Executive Jet Aviation, Inc. v. City of Cleveland*, 409 U.S. 249

(1972), the Supreme Court moved away from a strict locality test and indicated that the emphasis

should be placed on an analysis of whether the alleged wrong bore a significant relationship to

traditional maritime activity.

> *Executive Jet* marked this Court's first clear departure from the strict locality
> test …. Noting "significant difficulties with the locality test", we refused to
> enter into a debate over whether the tort occurred where the plane had crashed
> and been destroyed (the navigable waters of Lake Erie) or where it had struck
> the sea gulls (over land). Rather, we held that jurisdiction was lacking because
> "the wrong [did not] bear a significant relationship to traditional maritime
> activity."

*Sisson*, 497 U.S. at 360-61 (discussing and quoting *Executive Jet's* introduction of a nexus

component to the jurisdiction test) (internal citations omitted).

Subsequently, the Supreme Court clarified that the nexus requirement (*i.e.* wrong having

relationship with maritime commerce) applies in all maritime cases and not just commercial

maritime cases. *Foremost Ins. Co., v. Richardson*, 457 U.S. 668 (1982) (approving a broader

interpretation of *Executive Jet*).

In the wake of these pronouncements, courts have since applied a two-part test in

determining whether an exercise of admiralty tort jurisdiction is appropriate in a given

circumstance. A party seeking to invoke federal admiralty jurisdiction in respect to a tort claim

is generally obliged to satisfy the following conditions:  (a) connection with maritime activity

(the "nexus" requirement) and (b) location. *Jerome B. Grubart, Inc. v. Great Lakes Dredge &*

*Dock Co.*, 513 U.S. 527, 534 (1995); *Doe v. Celebrity Cruises*, 394 F.3d 891, 900 (11th Cir.

2004). However, the more recent authority indicates that while locality is still considered, the

real focus of the inquiry is trained on the question of whether the tort has a substantial

relationship to some traditional maritime activity. *Doe*, 394 F.3d at 900; *Maritima Petroleo v.*

*Ocean Rig 1 A.S.*, 78 F.Supp. 162 (S.D.N.Y. 1999) (whether the tort occurred on navigable

waters is "not necessarily determinative.")

Plaintiffs submit that this test should not be applied as rigidly as Defendants suggest so as

to deny an exercise of maritime jurisdiction in a case like this involving traditional maritime

activity of the chartering and operation of ocean going vessels. Indeed, the Supreme Court's most recent pronouncement on maritime jurisdiction reflects an expansive view of the contours of admiralty jurisdiction stating that "the shore is now an artificial place to draw a line." *Norfolk Southern Railway v. James N. Kirby, Pty. Ltd.*, 543 U.S. 14, 25, 125 S.Ct. at 388; 2004 A.M.C. 2705 (2004). Accordingly, and as explained below, the claims here satisfy both elements of the test.

### A.    Plaintiffs' Claims Satisfy The Nexus Requirement.

The nexus requirement involves an analysis of two factors: (1) whether the "**general features** of the type of incident involved" had a "**potentially disruptive** impact on maritime commerce", and (2) whether the "**general character** of the activity giving rise to the incident bears a **substantial relationship to traditional maritime** activity." *Grubart*, 513 U.S. at 538; *see also Sisson*, 497 U.S. at 363.

The jurisprudence addressing the nexus requirement indicates that the courts have little difficulty in finding satisfaction of the two elements whenever the underlying claim involves some activity relating to traditional shipping. *See, e.g., Doe*, 394 F.3d at 900 (first prong satisfied where claim involved activity by crewmember on cruise ship); *Exter Ship. v. Kilakos*, 310 F.Supp. 2d 1301, 1310 (N.D. Ga. 2004) (nexus exists because underlying misrepresentations affected movement of cargo and ships on high seas); *Elmwood Dry Dock v. H&A Trading Co.*, 1998 AMC 2681 (E.D. La. 1997) (nexus satisfied where alleged torts involved repair, maintenance and operation of ocean going vessel).

Applying this criteria to the instant case, there can be no reasonable debate that the activities by Defendants involved traditional maritime conduct. Defendants created fake charter parties and entered into secret charter parties to position themselves to be able to skim from the

hire paid in connection with the vessel's carriage of cargo. (Verified Complaint at ¶10-11, 15-16,

19, 21-28, 32, 36-37, 42-47.) There is no more fundamental maritime activity than the charter

and operation of ocean-going cargo ships. *Morewood v. Enequist*, 62 U.S. 491 (1859); *Kirno*

*Hill Corp. v. Holt*, 618 F.2d 982 (2d Cir. 1980).

　　In an attempt to support their argument that the nexus requirement is lacking in this case,

Defendants rely on a string of cases which have no bearing on this fact pattern and are easily

distinguished. (*See* Defendants' Memo. p. 14). Those cases are one-off situations where the

plaintiffs were reaching for a basis to support a connection with traditional maritime activity

when there clearly was none. The cases include fact patterns involving a plane crash following a

collision with birds, *Executive Jet*, 409 U.S. 358; a recreational sailboat owner's conversion

claim, *Ramirez v. Butler*, 319 F.Supp.2d 1034 (N.D. Cal. 2004); a car accident on land, *Madison*

*Coal*, 321 F.Supp.2d 809; a medical malpractice claim, *Rollin v. Kimberly Clark Tissue Co.*, 211

F.R.D. 670 (S.D. Ala. 2001); and a trucking accident involving the dumping of raw meat into a

dried up river *Adventures Unlimited, Inc. v. Chrisman*, 208 F.Supp.2d 871 (E.D. Tenn. 2002). It

is no wonder that admiralty jurisdiction was lacking in these cases, but these cases have no

bearing on a situation involving fraud in connection with multiple long-term time charter

agreements.

## B.　*Plaintiffs' Claims Similarly Satisfy The Location Requirement.*

　　As outlined above, the second element of the test for admiralty tort jurisdiction involves a

locality consideration. While the test invites mechanical application in tort cases involving a

physical injury or accident, the analysis is not so mechanical or geographic in cases involving

intentional torts such as present here. As outlined by Professor Schoenbaum,

> [I]n applying the locality rule to borderline situations, the courts hold that the
> tort occurs where the negligent or intentional act takes effect, not where the act

> occurred. Thus, if shots are fired from the land at a boat on navigable waters,
> the resulting tort is within admiralty jurisdiction. Intentional torts such as
> fraud, misrepresentation and fraudulent inducement to contract and defamation
> must have an effect on navigable waters to be within admiralty jurisdiction.

1 Thomas J. Schoenbaum, *Admiralty & Maritime Law* p. 99 (4th ed. 2004); *see also Harville v.*

*Johns-Manville Prods. Corp.*, 731 F.2d 775, 782 (11th Cir. 1984) (under the locality test, the tort

is deemed to have occurred not where the tort took place, but rather where the tortious act took

effect).

　　　　In these types of situations, the courts have not drawn an artificial border at the shoreline

with respect to whether admiralty jurisdiction exists. Obviously, to have done so would, of

necessity, have divested the courts of jurisdiction in virtually every maritime fraud case unless

the conspirators were in the same rowboat, so to speak, when they hatched their plan. Instead,

the courts examine whether the tortious conduct had some impact on navigable waters or a vessel

engaged in traditional maritime activity.

　　　　By way of example, in *Exter Shipping*, 310 F.Supp.2d 1301 (N.D. GA 2004) the court

examined the issue of admiralty tort jurisdiction where the plaintiff alleged that the defendants

had misrepresented the financial wherewithal of a charterer to perform charter party contracts.

The defendants there (like here) argued that because the alleged fraud and misrepresentation took

place on land where the charters were executed and because the impact of these torts included

subsequent financial damage, the injuries were land-based thus precluding an exercise of

admiralty jurisdiction. The court rejected that argument and found that by virtue of the

misrepresentation, the vessels were chartered and cargo was carried and ultimately seized,

thereby satisfying the locality criteria:

> Certainly, the alleged misrepresentations regarding ownership and disposition
> of the cargo which ultimately controlled the movement of the ships, the

> discharge of their cargo, and their seizure by Metro Trading's creditors were
> injuries at sea. Therefore, the "situs" requirement has been met.

*Id.* at 1310;

The same can be said in this case. Without a doubt, it was the fraud perpetrated by the Defendants that enabled them to obtain the position of middle charterers and garner control of the vessels. That control enabled them to maintain the subterfuge that a direct contract with PDVSA was in existence, when in fact it was not, and skim the hire payments made in connection with the vessels performance and carriage of cargo.

A similar situation was presented in *Elmwood*, 1998 AMC 2681. Here, plaintiffs alleged, *inter alia*, financial losses as a consequence of the defendant's conversion and misappropriation of funds which should have been used to operate and maintain a vessel. The court found that the conduct of the defendant in misappropriating the funds satisfied both aspects of the test for maritime tort jurisdiction because misappropriation had an effect on the vessel trading on navigable waters. "[E]very fact in this case [like the case at bar] and each alleged tort is connected to the vessel herself." 1998 AMC at 2692.

The First Circuit's decision in *Carroll v. Protection Maritime Ins. Co.*, 512 F.2d 4 (1st Cir. 1975), is also instructive. There, the plaintiff fishermen sued for tortious interference claiming that the defendant underwriters had black-listed them based upon the fact that they had previously asserted personal injury claims. Plaintiffs alleged that as a consequence they lost their current jobs and were unable to secure other employment. With respect to the locale analysis, the First Circuit noted that the location of the blacklisting was irrelevant, noting that "admiralty jurisdiction depends not on the place where the injury is inflicted but on the nature of the service and its relationship to the operation of a vessel plying in navigable waters." *Id.* at 6. The court then concluded that interference with plaintiffs' shipping business, including handling

of cargo and free operation of its vessels, as a consequence of the blacklisting, was sufficient to confer admiralty jurisdiction.

The lesson of all these cases is simple: If land-based tortious conduct has an effect on the management, operation or movement of a vessel at sea, an exercise of admiralty jurisdiction would be proper because the tort has an impact on and bears a relationship to traditional maritime activity occurring on navigable waters. In the context of a time charter, the sole basis for the operation of the vessel is for the purpose of the carriage of cargo in exchange for the payment of hire or freight. The Defendants' fraud here impacted directly on the operation, management, control and earnings of multiple vessels as they carried cargo at sea. The Defendants were, unbeknownst to the Plaintiffs, the actual, secret charterers. They manipulated the charter documents so as to skim the hire paid in connection with the vessel's transport of cargo, diminished the vessels' earnings while secretly controlling the movements and trading pattern of the vessels under a scheme which left Novoship with the false impression that the charterer was PDVSA. The argument - that because the scheme also involved the transfer of money at banks on land - is far too artificial to deprive the Court of maritime jurisdiction in the circumstances of this case, and the authority cited above dispels the argument.

In *Cargill v. Esal (Commodities), Ltd.*, 1984 U.S. Dist. LEXIS 17839 (S.D.N.Y. 1984), Judge Knapp evaluated a similar jurisdictional issue involving a fraudulent bill of lading, a contract which also involves the transportation of cargoes at sea. The plaintiff alleged that the defendant had wrongfully exercised dominion and control over plaintiff's cargo by creating and presenting to a bank a fraudulent bill of lading (activities which necessarily could only occur on land) while the cargo was at sea. The court stated, "Defendant, through its agent, wrongfully exercised dominion and control over plaintiff's cargo and effected such conversion while the

cargo was on navigable waters. Such conduct is a maritime tort and falls within our admiralty jurisdiction." 1984 U.S. Dist. Lexis at *3. There is no practical difference between a tort arising out of a fraudulent bill of lading and one arising out of a fake charter. As far as jurisdiction is concerned, the result should be the same. [6] This case is not, as Defendants would describe it, a mere "garden variety financial tort[s]" or "business tort[s]". No amount of editing can alter the fundamental admiralty nature of this fraud.

The case authority cited by Defendants (where jurisdiction was rejected) provides little support for their position given the marked difference between the fact patterns there and our situation. Defendants place great stock in the rejection of admiralty tort jurisdiction in *Kuehne & Nagel v. Geosource, Inc.,* 874 F.2d 283 (5th Cir. 1989), but fail to meaningfully address the fact that the fundamental reason why maritime jurisdiction was rejected there was because the alleged injury related to the failed *land based leg* of the combined transport of the cargo, not the ocean transport. The *Kuehne* court considered the admiralty jurisdiction issue in a mixed contract where the land-based portion involved over a thousand miles of trucking. The harm felt as a consequence of the alleged wrongful/fraudulent conduct (fraudulent inducement) , however, related primarily to that land based leg. As such, the court concluded that there was no impact on the water – the water leg having essentially been completed.

> The fact that some of the cargo sat on the vessels is incidental to the forwarders' damages, most of which related to the added cost of the overland transportation. At best, the injury, if any, that occurred on navigable water was too remote from the tortious act to meet the situs requirement for admiralty jurisdiction.

874 F.2d at 289.

---

[6] *See also Malaysia Int'l v. Sinochem,* 436 F.3d 349 (3d Cir. 2006) (location test easily met based upon the defendant's alleged land-based misrepresentations to the Chinese Admiralty Court);

This case bears no resemblance to the facts of the claims at bar, which involve the fraudulent charters of ocean tankers, the loss of revenue in respect to the carriage of cargo on the high seas, and a scheme that unduly deprived the Plaintiffs of a legitimate and credit worthy charterer. There is no land component, with the exception that monies paid, or better stated not paid, moved through banks located on land. Unlike the losses felt in *Kuehne*, which stemmed from additional land based trucking charges, the losses here relate to lower hire rates being paid for cargo actually carried at sea. This, coupled with the continuing nature of the fraudulent operation necessary to maintain the control of the vessels by Defendants pursuant to the secret charter parties was central to causing the damages suffered by the Plaintiffs and negate any application of the *Kuehne* rationale.

Likewise, the rationale underlying the court's rejection of jurisdiction in *Maritima Petroleo Engenharia Ltda. v. Ocean Rig I AS,* 78 F.Supp.2d 162 (S.D.N.Y. 1999) is inapplicable here. In that case, jurisdiction was rejected because the underlying contract (a MOA) was determined to be a mere preliminary contract, and not a maritime contract. Hence, since that agreement merely set the stage for further land based negotiations designed to perhaps later lead to a maritime contract, there was not and could not have been any impact on navigable waters.

The case of *Smith v. Mitlof,* 198 F.Supp.2d 492 (S.D.N.Y. 2002) does not support the Defendants' position either. The plaintiffs in *Smith* alleged that at the time of the sale of a vessel, the seller was aware that it was dangerous and did not comply with federal regulations and that the failure to disclose this information constituted a tort. As in *Maritima*, the court first found that the underlying contract – sale of a vessel – was not a maritime contract and hence no admiralty tort jurisdiction existed over the claims of fraud and negligent misrepresentation which related to the non-maritime sale contract.

Finally, reliance on *In Re Madison Coal & Supply Co.*, 321 F.Supp.2d 809 (S.D. WV. 2003) is equally unpersuasive. *Madison Coal* involved an evaluation of admiralty tort jurisdiction in the context of an off-duty deckhand who, while intoxicated from consumption on shore, killed a person in a motor vehicle accident.

The complaint properly pled an admiralty and maritime claim for fraud arising out of the creation, execution and performance of a maritime contract of charter party. The impact was felt on the water as the fraud diminished the earnings of the vessels for the actual carriage of cargo and placed the Plaintiffs in the position of having an un-creditworthy charterer at the helm of their ships.

### C.    A finding of admiralty jurisdiction would be consistent with recent Supreme Court pronouncements expanding maritime jurisdiction and the underlying policy of achieving uniformity in the maritime industry.

In *Norfolk Southern Railway v. James N. Kirby, Pty. Ltd.*, 543 U.S. 14 (2004), the Supreme Court significantly expanded the scope of maritime contract jurisdiction. Here, cargo was being carried under a multimodal bill of lading contract of carriage which involved land and water transport. Although the injury complained of occurred during the land leg, the Court found maritime jurisdiction, noting that the key inquiry was whether the principal objective of the contract was maritime commerce: "So long as a bill of lading requires substantial carriage of goods by sea, its purpose is to effectuate maritime commerce—and thus it is a maritime contract." *Kirby*, 543 U.S. at 27.

With that decision, the "mixed contract" doctrine was substantially eroded if not swept away, and interestingly, had *Kuehne & Nagel* been decided after *Kirby*, the *Kuehne* court might well have felt compelled to exercise maritime jurisdiction.

Such was the result in *Doe v. Celebrity Cruises Inc.*, 394 F.3d 891 (11th Cir. 2004), where the Eleventh Circuit – following the Supreme Court's lead in *Kirby* - undertook a more expansive view on the bounds of jurisdiction. In *Doe*, admiralty tort jurisdiction was held even though the act (sexual assault by an off-duty crewmember against a passenger) occurred on shore. The court noted that although there was temptation to draw bright lines rule between activities which occur on land and at sea in the jurisdictional analysis, where the overall situation is more "salty", courts should follow the more expansive view recently espoused by the Supreme Court in *Kirby*, and not draw the "shore [as] an artificial place to draw a line." *Kirby*, 125 S.Ct. at 388.

Commentators equally support the view as set forth in *Kirby* that the concept of admiralty jurisdiction is changing and that the locality requirement should not be emphasized but rather subsumed into the nexus requirement, especially where the maritime interest is so strong that adherence to a strict locality rule would impede the fundamental purposes of admiralty jurisdiction.

> Whether a tort occurs on the water should be one factor to be considered in determining whether the tort meets the nexus requirement. The Admiralty Extension Act has helped by including damage done on land by vessels in navigable waters, and the courts have made an exception for seamen's claims arising out of their maritime status. As the courts are becoming accustomed to requiring a maritime nexus for tort claims as they have for contract claims, there seems to be no principled reason for excluding tort claims merely because they lack a maritime locale.

*1Benedict on Admiralty* § 171, p. 11-30-11-31 (7th Ed. rev. by S. Friedel 1988) (citations omitted). *See also*, Robert Force, *Determining Admiralty Tort Jurisdiction: An Alternative Analytical Framework*, 21 J. Mar. L & Com. 1, 78-80 (1990); *see also* Bederman, D. and Wierwille, J., *Tulane Maritime Law Journal*, Summer 2007, Vol. 31, No. 2, 295, 312

(recognizing that the courts have been expanding the boundaries of admiralty jurisdiction to provide recourse to justice to individuals participating in maritime commerce).

One of the rationales for the Rule B attachment procedure is to secure a claim in an international arena where assets can easily be moved out of a jurisdiction and hidden from creditors. It evens the playing field in securing claims so that a judgment on the merits will not prove to be meaningless. It is a remedy which, as a matter of public policy, should be generously afforded to victims of international frauds such as this committed by the Defendants against the Plaintiffs.

## POINT III

### THERE IS AN ALTERNATIVE AND INDEPENDENT BASIS FOR MARITIME JURISDICTION, BECAUSE THE CLAIMS INVOLVE THE BREACH OF OBLIGATIONS UNDER MARITIME CHARTER PARTY CONTRACTS

The time charter parties relating to the three vessels were, unbeknownst to plaintiffs, contracts with the Ruperti shell entities. Those secret charter parties were an essential element to carrying out the fraud. In establishing and performing under these charter parties, defendants breached their obligation of good faith and fair dealing inherent in all maritime contracts. As a result of defendants' breach of the implied covenant of good faith and fair dealing, Plaintiffs Cally, Vital and Dainford have suffered damages in contract which clearly support admiralty contract jurisdiction.

As stated in *Time Charters*, Wilford, M., Coghlin, T., and Kimball, J. (4th Ed. 1995), at 56, "Charters have long been considered maritime contracts." *1 Benedict on Admiralty,* §106, p.7-18 (6th Ed., 1988), states "[m]ost transactions concerning or involving vessels are within admiralty jurisdiction, including 'any claim arising out of any agreement for the carriage of

goods in a vessel or to the use or hire of a vessel." The time charter parties in this case are classic maritime contracts.

Maritime contracts impose an obligation of good faith and fair dealing between the parties. *FWF Inc. v. Detroit Diesel Corp.*, 494 F.Supp.2d 1342, 1369 (S.D. Fl. 2007) (citing, *Misano di Navigazione SpA v. U.S.*, 968 F.2d 273, 274-75 (2nd Cir. 1992) and *Restatement (Second) of Contracts*, §205)). In our situation, it is clear that this covenant of good faith and fair dealing has been breached by the Defendants, both with respect to the inception of the contracts and during the performance of the contracts. Plaintiffs suffered extensive losses as a result of this breach, which are compensable and which provide an independent basis for the Court's exercise of admiralty jurisdiction, and the platform from which the Rule B attachment can issue.

## POINT iV

### THE ORIGINAL COMPLAINT ADEQUATELY SETS FORTH DAMAGES

To maintain an attachment under Rule B for the quantum requested by the plaintiff, the plaintiff need only demonstrate a reasonable basis for the calculation of its claim. "It is well-settled that in an attachment proceeding, the plaintiff need not prove its damages with exactitude." *Dongbu Express Co. v. Navios Corp.*, 944 F. Supp. 235, 237 (S.D.N.Y. 1996), *citing Bergesen v. Lindholm*, 760 F. Supp. 976, 986 (D. Conn.. 1991) (holding that all that was required of the plaintiff was "a fair and reasonable estimate of damages"). *See also Rolls Royce Industrial Power (India) v. M/V FRATZIS M.*, 1996 A.M.C. 393, 402 (S.D.N.Y. 1995) (Haight, J.) (holding the plaintiff's duty in calculating its damages "goes no further" than "showing a reasonable relationship between the items or headings and the amounts sought to be protected",

holding also that "the plaintiff need not prove its damages with exactitude or to the very penny").

All that is necessary is for the court to determine that the plaintiff's claims are not frivolous. *Id.*

On the other hand, for a defendant to cause the quantum of a Rule B attachment to be reduced, the level of proof required is heightened: the defendant has the greater burden of showing that the amount of security was excessive. *See Benedict on Admiralty* § 3.02[D][7] *citing Whitney-Fidalgo Seafoods v. MISS TAMMY*, 542 F. Supp. 1302, 1304-05 (W.D.Wash. 1982) (holding that the defendant's burden in seeking a reduction of an attachment is to supply proof that the quantum attached "is clearly excessive as compared to the claim figure", and finding that where there is a likelihood of recovery of costs, attorneys' fees and interest, such amounts may not be discounted from the claim). It is well established that the burden on a party seeking the reduction of security is considerably greater than where the amount of security is set by statute or is provided by rule. G. Gilmore & D. Black, *The Law of Admiralty* § 9-89, at 799-800 (2d ed. 1975); 7A *Moore's Federal Practice* P E.14, at E-706 (2d ed. 1979).

Here, and based upon the submission of the declaration from UK counsel for the Plaintiff, Michelle Jacqueline Linderman, which is incorporated by reference herein and attached hereto, there is no basis upon which to reduce either the quantum of the claim, or that portion which relates to the expected costs of prosecution.

## CONCLUSION

For the foregoing reasons, the Defendants' motion should be denied. The Complaint adequately pled an admiralty and maritime claim in tort and contract, and the Court is free to search the record for the evidence in support of that proposition. The fraud involved fundamental maritime contracts and impacted the operations of vessels on the high seas. The contracts themselves are clearly maritime contracts and provide an alternative basis for the

exercise of jurisdiction. No Rule 12(b) motion is properly before the Court and there is no evidence in the record upon which to reduce the quantum of the claims.

DATED:      New York, New York
            December 13, 2007

                              FREEHILL HOGAN & MAHAR, LLP
                              Attorneys for Plaintiffs

            BY:

                                  Peter J. Gutowski (PG 2200)
                                  Gin Venezia (GV 1551)
                                  Pamela L. Schultz (PS 8675)