486-07/PJG
FREEHILL HOGAN & MAHAR LLP
Attorneys for Plaintiffs
80 Pine Street
New York, NY 10005
(212) 425-1900
(212) 425-1901 fax
Peter J. Gutowski (PG 2200)
Gina Venezia (GV 1551)
Pamela L. Schultz (PS 8675)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NOVOSHIP (UK) LIMITED, CALLY SHIPHOLDINGS
INC., VITAL SHIPPING CORPORATION, and
DAINFORD NAVIGATION INC.,

Plaintiffs,

- against -

WILMER RUPERTI, SEA PIONEER SHIPPING
CORPORATION, and PMI TRADING INC., JOHN DOE
(fictitious) and JOHN DOE INC. (fictitious),

Defendants.

07-CV- 9876 (DLC)

## MEMORANDUM OF LAW IN SUPPORT
## OF APPLICATION FOR RENEWAL OF ORDER OF ATTACHMENT
## PURSUANT TO SUPPLEMENTAL ADMIRALTY RULE B

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ................................................................................................ i

PRELIMINARY STATEMENT ........................................................................................ 1

PROCEDURAL HISTORY ............................................................................................... 1

      A.    Initial Filing of the Complaint and Issuance of Order of Attachment. ........................................................................................................ 1

      B.    The Hearing of December 14, 2007, Suspense of the Order of Attachment, and Defendants' Subsequent Conduct. ...................................... 2

      C.    Developments in the Florida Action. ................................................... 3

SUMMARY OF RELEVANT FACTS .............................................................................. 4

LEGAL ARGUMENT

POINT I

THE REQUIREMENTS OF RULE B ARE MET, AS DEFENDANTS CANNOT BE FOUND IN THIS DISTRICT AND PLAINTIFFS HAVE STATED VALID MARITIME CLAIMS AGAINST DEFENDANTS ...................................... 8

      A.  The Requirements of Rule B. .................................................................. 8

      B.  Plaintiffs' Amended Complaint States A Valid Maritime Tort Claim for Fraud Relating to the Charter of Ocean-Going Vessels... .............................. 10

            1.    Plaintiffs' claims satisfy the nexus requirement. ......................... 12

            2.    Plaintiffs' claims similarly satisfy the location requirement. ................................................................................. 13

            3.    A finding of admiralty tort jurisdiction would be consistent with recent Supreme Court pronouncements expanding maritime jurisdiction and the underlying policy of achieving uniformity in the maritime industry. ............................ 19

      C.  Plaintiffs' Amended Complaint States A Valid Maritime Claim for Breach of Obligations Under Maritime Charter Party Contracts ............................ 21

POINT II

THE AMENDED COMPLAINT RELATES BACK TO THE FILING OF
THE ORIGINAL COMPLAINT AND THUS THE ATTACHMENT OF THE
FUNDS CURRENTLY RESTRAINED SHOULD BE MAINTAINED..................................... 22

CONCLUSION............................................................................................................. 25

## TABLE OF AUTHORITIES

**Cases**

Adventures Unlimited, Inc. v. Chrisman, 208 F.Supp.2d 871 (E.D. Tenn. 2002)........................ 13

Aqua Stoli Shipping Ltd. v. Gardner Smith Pty. Ltd., 460 F.3d 434 (2d Cir. 2006).................. 3, 9

Barbara v. N.Y. Stock Exchange, 99 F.3d 49, 56 (2d Cir. 1996) ................................. 22

Bergesen v. Lindholm, 760 F. Supp. 976 (D. Conn.. 1991) ......................................... 10

Cargill v. Esal (Commodities), Ltd., 1984 U.S. Dist. LEXIS 17839 (S.D.N.Y. 1984) ............... 17

Carroll v. Protection Maritime Ins. Co., 512 F.2d 4 (1st Cir. 1975)................................ 13

Correspondent Serv. Corp. v. First Equities Corp. of Florida, 338 F. 3d 119, 125 (2d Cir.

2003) ....................................................................................... 22, 23, 24

Cross & Cross Properties, Ltd. v. Everett Allied Co., 886 F.2d 497, 502 (2d Cir. 1989) ............ 21

Deiulemar Compania Di Navigazione, 2005 U.S. Dist. LEXIS 40783 ......................... 8

Doe v. Celebrity Cruises Inc., 394 F.3d 891 (11th Cir. 2004)........................... 11, 12, 18

Dongbu Express Co. v. Navios Corp., 944 F. Supp. 235 (S.D.N.Y. 1996) ................................. 10

E.R. Squibb & Sons, Inc. v. Lloyd's & Companies Accident and Cas. Ins. Co., 241 F.3d

154, 163........................................................................................ 22

Elmwood Dry Dock v. H&A Trading Co., 1998 AMC 2681 (E.D. La. 1997)...................... 12, 13

Executive Jet Aviation, Inc. v. City of Cleveland, 409 U.S. 249 (1972)......................... 10, 11, 13

Exter Ship. v. Kilakos, 310 F.Supp. 2d 1301 (N.D. Ga. 2004)................................ 12, 14

Foremost Ins. Co., v. Richardson, 457 U.S. 668 (1982)................................................. 11

FWF Inc. v. Detroit Diesel Corp., 494 F.Supp.2d 1342 (S.D. Fl. 2007) ...................................... 21

Great Eastern Shipping Co. Ltd. v. Phoenix Shipping Corporation and Phoenix Shipping

Pty Ltd., 07-civ-8373 (DLC) ................................................................. 3

Harville v. Johns-Manville Prods. Corp., 731 F.2d 775 (11th Cir. 1984) ...................................... 14

In Re Madison Coal & Supply Co., 321 F.Supp.2d 809 (S.D. Wv. 2003) .............................. 13, 18

In Re Chaus Securities Litigation, 801 F.Supp. 1257, 1264 (S.D.N.Y. 1992) ............................ 23

Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co., 513 U.S. 527 (1995) .............. 11, 12

Kirno Hill Corp. v. Holt, 618 F.2d 982 (2d Cir. 1980) ................................................................ 13

Koal Ind. Corp. v. Asland S.A., 803 F.Supp. 1143, 1158 (S.D.N.Y. 1992) ................................ 23

Kuehne & Nagel v. Geosource, Inc., 874 F.2d 283 (5th Cir. 1989) ........................................ 17, 18

Linea Naviera de Cabotaje, C.A. v. Mar Caribe de Navegacion, C.A., 169 F.Supp.2d

1341 (N.D. Fla. 2001) .............................................................................................................. 9

Maersk, Inc. v. Neewra, Inc., 443 F.Supp.2d 519 (S.D.N.Y. 2006) ............................................ 9

Malaysia Int'l v. Sinochem, 436 F.3d 349 (3d Cir. 2006) .......................................................... 17

Maritima Petroleo Engenharia Ltda. v. Ocean Rig I AS, 78 F.Supp.2d 162 (S.D.N.Y.

1999) ................................................................................................................................. 11, 18

Misano di Navigazione SpA v. U.S., 968 F.2d 273 (2nd Cir. 1992) ............................................ 21

Morewood v. Enequist, 62 U.S. 491 (1859) ............................................................................... 13

Moore's Federal Practice, §15.19[2], Vol. 3 (3rd Ed. 2007) ........................................................ 23

Norfolk Southern Railway v. James N. Kirby, Pty. Ltd., 543 U.S. 14 (2004), 125 S.Ct.

385; 2004 A.M.C. 2705 (2004) ......................................................................................... 12, 18

Ramirez v. Butler, 319 F.Supp.2d 1034 (N.D. Cal. 2004) .......................................................... 13

Rollin v. Kimberly Clark Tissue Co., 211 F.R.D. 670 (S.D. Ala. 2001) ...................................... 13

Rolls Royce Industrial Power (India) v. M/V FRATZIS M., 1996 A.M.C. 393 (S.D.N.Y.

1995) ...................................................................................................................................... 10

Seaplus Line Co. v. Bulkhandling Handymax, AS, 409 F. Supp. 2d 316 (S.D.N.Y. 2005) .......... 8

Sisson v. Ruby, 497 U.S. 358 (1990) .......................................................................................... 10

Smith v. Mitlof, 198 F.Supp.2d 492 (S.D.N.Y. 2002).................................................................... 18

The Plymouth, 70 U.S. 20 (1866) ................................................................................................. 10

Tide Line, Inc. v. Eastrade Commodities, Inc., 2007 AMC 252 (S.D.N.Y. 2006)....................... 23

T&O Shipping, Ltd. v. Source Link Co., Ltd., 2006 U.S.Dist. Lexis 60700 (S.D.N.Y.

    2006) ..................................................................................................................................... 24

Ullises Ship. Corp. v. FAL Shipping Co. Ltd., 415 F. Supp.2d 318, 322 (S.D.N.Y. 2006)...... 8, 9

Wajilam Exports (Singapore) Pte Ltd. v. ATL Ship, 2006 AMC 2744 (S.D.N.Y. 2006)............. 9

## Statutory Authority and Other Rules

Federal Rule of Civil Procedure 6 ................................................................................................. 6

Supplemental Rule B ...........................................................................................................passim

Federal Rule of Civil Procedure 15 ............................................................................................. 22

Supplemental Rule E..................................................................................................................... 23

## Other Authorities

7A Moore's Federal Practice P E.14, at E-706 (2d ed. 1979) ...................................................... 20

Admiralty & Maritime Law p. 99 (4th ed. 2004) ........................................................................ 14

Benedict on Admiralty § 171, p. 11-30-11-31 (7th Ed. rev. by S. Friedel 1988) .......................... 20

Benedict on Admiralty, §106, p.7-18 (6th Ed., 1988) .................................................................. 21

Determining Admiralty Tort Jurisdiction: An Alternative Analytical Framework, 21 J.

    Mar. L & Com. 1, 78-80 (1990)........................................................................................... 20

Restatement (Second) of Contracts, §205....................................................................................... 21

The Contemporary Contours of Admiralty Jurisdiction, Tulane Maritime Law Journal,
Volume 31, Summer 2007 ........................................................................................... 20

Time Charters, Wilford, M., Coghlin, T., and Kimball, J. (4th Ed. 1995) .................................... 21

**PRELIMINARY STATEMENT**

In accordance with the Court's directive at the hearing held on December 14, 2007, Plaintiffs Novoship (UK) Limited ("Novoship"), Cally Shipholdings Inc. ("Cally"), Vital Shipping Corporation ("Vital"), and Dainford Navigation Inc. ("Dainford") (collectively "Plaintiffs") submit this Memorandum of Law in support of their motion for renewal of the order of attachment in accordance with Supplemental Admiralty Rule B, based upon the First Amended Verified Complaint and the declarations and pleadings filed herein.

**PROCEDURAL HISTORY**

**A.    Initial Filing of the Complaint and Issuance of Order of Attachment.**

On November 7, 2007, Plaintiffs filed a Verified Complaint against Defendants Wilmer Ruperti ("Ruperti"), Sea Pioneer Shipping Corporation ("Sea Pioneer"), and PMI Trading Inc. ("PMI"), alleging admiralty claims grounded in contract and fraud associated with the long-term time charters of Plaintiffs' ocean-going tankers. (*See, e.g.*, original Verified Complaint at ¶10, 11, 15, 44-50). At the time of filing, Plaintiffs applied for an order of attachment pursuant to Supplemental Admiralty Rule B seeking a restraint of Defendants' assets in the amount $17,149,420.00. In accordance with Rule B, Plaintiffs' application was supported by the Verified Complaint and an affidavit stating that Defendants cannot be found within the district. (*See* Verified Complaint & Schultz Affidavit).

On November 7, 2007, District Judge Sweet, acting as the Part 1 Judge, issued an order of attachment. Process of Maritime Attachment ("PMAG") was thereafter issued and served on a variety of banking institutions, but, to date, only a total of $3,054,265.47 has been restrained (approximately 18% of the amount stated in the PMAG).[1]

---

[1] Almost immediately upon initial service of the original order of attachment, transfers involving these Defendants were restrained. Notice was then provided as per the Local Rules. Since that point in time,

Defendants thereafter entered a special appearance and filed a motion to vacate the initial order of attachment, arguing essentially that the claims asserted against them are not maritime and hence do not support admiralty jurisdiction or entitlement to an attachment under Rule B. Plaintiffs filed an opposition to Defendants' motion pointing out the fundamental maritime nature of the fraud and the contractual aspects of the claims asserted in the original complaint. Plaintiffs also filed a First Amended Verified Complaint (the "Amended Complaint") on December 13, 2007. The substance of the allegations against Defendants in the Amended Complaint is the same as contained in the original complaint, but the Amended Complaint elaborates further on the basis for the Court's exercise of maritime jurisdiction. (*See* Amended Comp. ¶¶ 44-56).

**B.    The Hearing of December 14, 2007, Suspense of the Order of Attachment, and Defendants' Subsequent Conduct.**

A hearing was held on Defendants' motion on December 14, 2007. During the hearing, the Court essentially suspended the order of attachment issued by Judge Sweet, by allowing the attachment over the funds that had already been restrained to remain in place pending resolution of the current renewal application, but preventing the attachment of further funds pursuant to the original order. (Hearing Tr. p. 11). The Court also directed Plaintiffs to submit an application for renewal of the attachment based upon the Amended Complaint. [2]

---

however, virtually no further restraints have occurred. To the extent the vast majority of ocean transportation contracts designate payments in U.S. dollars, which must clear through U.S. clearinghouse banks, it is presumed that Defendants had been withholding payments or have been transferring their funds in the names of yet other shell entities controlled by Defendant Ruperti in an effort to mask those transfers and circumvent the Court's order of attachment, pending action on their application to vacate.

[2] During the December 14 hearing, the Court indicated, *inter alia*, that Plaintiffs' initial Rule B application was not properly supported because a memorandum of law was not submitted with the original complaint, and attention should have been brought to this admiralty jurisdiction issue. (Hearing Tr. 14). With all due respect, Plaintiffs maintain their position that the original submission was both proper and sufficient. Rule B specifically provides that upon the filing of a verified complaint and an

Almost immediately after the Court suspended the initial order of attachment, the Defendants began transferring funds through this district again, and indeed had a celebrator dinner party at the fashionable, upscale La Dorada restaurant in Coral Gables, Florida. (*See* Gutowski Aff. ¶ 12). Not surprisingly, funds began flowing again on Monday, December 17. (Gutowski Aff. ¶ 11).

## C.    Developments in the Florida Action.

Prior to and during the December 14 hearing, Plaintiffs advised the Court that they had also filed a similar action in Florida against two of the three defendants identified in the captioned case. (*See* Ex. 1 to Gutowski Aff.; Hearing Tr. 4, 6).[3] With the filing of the original complaint in Florida, Plaintiffs requested the issuance of an order of attachment against the

---

affidavit regarding the defendant's presence, the court must enter a Rule B order of attachment if the conditions of Rule B appear to exist from "the complaint and affidavit." *See* Rule B(1)(b); *Aqua Stoli Ship. Ltd. v.Gardner Smith Pty. Ltd.*, 416 F.3d 434, 438 (2d Cir. 2006). The rule makes no mention of having to file a supporting memorandum or other affidavit support.

Further, and again with respect, Plaintiffs do not believe that the initial Rule B application was, for want of a better expression, "iffy" or one involving a legal issue over which the judges in this district have disagreed as was the situation in *Great Eastern Shipping Co. Ltd. v. Phoenix Shipping Corporation and Phoenix Shipping Pty Ltd.*, 07-civ-8373 (DLC).

Finally, although the factual aspects of Defendants' subterfuge demonstrate a carefully orchestrated, yet complex scheme, this case is at bottom one involving maritime fraudulent activity in connection with the creation, negotiation, execution and performance of charter party contracts – the epitome of maritime claims – and the case was thus sufficiently identified as a maritime based claim. While the fraud may have been unusual, Plaintiffs respectfully submit that the fundamental maritime connections were not. Plaintiffs therefore maintain the position asserted at the hearing and in their original opposition – that the original complaint sufficiently alleged the existence of maritime jurisdiction, and the requirements of Rule B had therefore been met. As an aside, the Florida Court had not yet denied Plaintiffs' original request for Rule B relief at the time this action was filed, and thus there was no indication that the maritime aspects of these claims would even become an issue.

Under all of these circumstances, Plaintiffs submit that their original complaint and application for an order of attachment pursuant to Rule B was proper and the issuance of the original attachment order by Judge Sweet warranted.

[3] Mr. Ruperti was not named as a defendant in the Florida action because Plaintiffs' preliminary investigation suggested that he might be present in that district for purposes of Rule B. Such is not the case here in New York.

defendants named in that action. The Florida Court initially denied the application on the basis that it questioned whether there was admiralty jurisdiction. An amended complaint was filed in that action -- the substantive allegations of which are identical to those contained in the Amended Complaint filed in this case – and the request for an order of attachment was renewed. (*See* Gutowski Aff. Ex. 6). On December 14, 2007, the Florida Court agreed that admiralty jurisdiction was present and issued an order of attachment. (See *id* at Ex. 7).

For the reasons explained herein, and as found by the District Judge in Florida, Plaintiffs submit that the requirements for Rule B have been met, admiralty jurisdiction exists for the claims which form the subject matter of this action, and the order of attachment should be reinstated *nunc pro tunc.*

## SUMMARY OF RELEVANT FACTS

Turning to the facts, and in broad outline, Plaintiffs' claims against Defendants involve both contractual and tort grounded theories of recovery arising out of the Defendants' long-term time charters of Plaintiffs' tanker vessels – including the M/T MARSHAL CHUYKOV, M/T MOSCOW KREMLIN, and M/T MOSCOW STARS. (*See* Amended Complaint at ¶1, 10, 11, 15, 44-56). Plaintiff Cally was the owner of the M/T MARSHAL CHUYKOV, Vital was the owner of the M/T MOSCOW KREMLIN and Dainford was the owner of the M/T MOSCOW STARS. Novoship acted as an agent and general manager for the owning companies and the vessels themselves. (*Id.* at ¶¶ 2-5).

The merits of the claims are now the subject of a London High Court litigation, and the captioned action was commenced as an adjunct to that litigation to obtain security and to ensure, as a consequence of the seizure of assets, Defendants' meaningful participation. (*Id.* at ¶¶ 57-59). As such, this Court will not be called upon to reach any determination about the merits.

However, insofar as the Court is to determine whether the requirements of Rule B have been met (*e.g.* whether Plaintiffs have a maritime claim), some discussion of the facts is necessary to enable the Court to conduct its review. Plaintiffs therefore provide the following review of the facts which confirm the admiralty and maritime nature of the circumstances giving rise to Plaintiffs' claims.[4]

Briefly, through a fraudulent scheme orchestrated by Defendant Ruperti (acting on his own behalf and through his two shell corporations -- Defendants Sea Pioneer and PMI) and Vladimir Mikhaylyuk ("Mikhaylyuk"), a dishonest employee of Plaintiff Novoship, Plaintiffs' tankers were chartered, unbeknownst to them, to shell entities created by Ruperti. (Amended Comp. at ¶¶ 6, 16-19, 25-32, 37-38, 44-50; Oskirko Decl. at ¶¶ 6, 12). The purpose and effect of the scheme was to enable Defendants to gain control (as time charterers) of the trading capacity of these vessels, all the while leaving Plaintiffs with the mistaken impression that the charter parties had in fact been effected directly with Petroleos de Venezuela S.A. ("PDVSA"). (Amended Complaint at ¶¶ 46-54), an agency of the Venezuelan government and a major charterer of oil carrying vessels in world-wide trade. (*Id.* at ¶13).

To effectuate their subterfuge and to position themselves as charterers, Defendant Ruperti and Mikhaylyuk falsified the charter party documents so as to create a paper record at Novoship which reflected such direct charters between Plaintiffs Cally/Vital/Dainford, as owners, and PDVSA, as charterer (the "fake charters"). (*Id.* at ¶¶ 10-11, 15-28, 32-37, 44, 46-47). It was subsequently discovered, however, that no such direct contractual relationship existed. (Oskirko Decl. at ¶4). Instead, the actual charterers were the two Ruperti shell entities -- PMI and Sea Pioneer -- who in turn had the direct contractual relationships with PDVSA (hereinafter the

---

[4] The facts are further discussed in the accompanying Declaration of Vladimar Petromsho Oskirko (Ex. 3 to the Gutowski Affidavit) and are also discussed within the argument section of this memorandum.

"secret" or "actual" charters). (Amended Comp. at ¶¶ 15, 19, 31, 38 & 47). Absent a contractual relationship with PDVSA, it was thus Ruperti and his two shell entities which had the time charter control over Plaintiffs' vessels and, equally important, the time charter obligations and duties owed to Plaintiffs under the terms of the time charter agreements. (*Id.* at ¶¶ 15, 19, 31, 38, 47, 50-55; Oskirko Decl. at 7-10). In their capacity as "secret" middle charterers, Defendants positioned themselves so as to be able to manipulate the charter rates in the fake charters, mask from Novoship the actual daily earnings of the vessels, and create a spread between what was being paid by PDVSA and what was being forwarded to Novoship so as to enable them to skim the difference -- a difference which was sizable amounting to losses in excess of 17 million dollars, and perhaps significantly more. (Amended Comp. at ¶¶ 15, 24, 36, 42-49, 54).

Contrary to Defendants' suggestion, these transactions and fraudulent schemes had direct effect far beyond the shoreline and beyond the initial conspiratorial exchanges. The direct effect of Defendants' actions was the creation of fake and secret charter parties which enabled them to gain total control of the operation, movement, and earnings of Plaintiffs' vessels under circumstances where they masked the true identity of the charterer. (*Id., generally* and at ¶¶ 46-56; and Oskirko Decl. at ¶¶ 7-10) This control continued for years during the duration of the charters, as the Defendants skimmed the hire twice a month as it was being paid to them by PDVSA, and then repaid to Plaintiffs at the discounted rate specified in the fake charters. The fraud continued throughout the entire period as it was Defendants who issued the trading and sailing orders to Plaintiffs, and effectively controlled the vessels as they carried cargo, unbeknownst to Novoship. (Amended Comp. at ¶50-54).

More importantly, the entire time the vessels were trading under the secret/actual charters, Defendants placed Plaintiffs at a substantial risk for a multitude of liabilities flowing

from the fact that the time charterer's obligations and duties owed to Plaintiffs were the responsibility of the Ruperti and his shell entities, not the substantial oil giant PDVSA. (*Id.* at ¶¶ 51-55; Oskirko Decl. at ¶¶ 6-12). In time charter transactions such as these, the charterer assumes significant aspects of the vessel's physical operation and the risks in the movement of oil cargoes. The charterer is given essentially unfettered discretion to trade the vessel worldwide, and it selects the load and discharge ports, and hence the trading pattern of the vessel. (Oskirko Decl. at ¶9). It bunkers the vessel. It is responsible for arranging tugs, pilots, etc. As a consequence, significant duties and liabilities attach to a time charterer under a time charter contract, and hence, the financial wherewithal of a potential charterer is of critical import in a vessel owner's assessment of whether to enter into the contract with a particular entity. (Oskirko Decl. at ¶10-12).

As outlined in the accompanying Declaration, had the true identity of the chartering entities been disclosed, Plaintiffs would have never entered into these charter transactions with the Ruperti shell entities and Defendants would have never obtained control of these vessels or had the opportunity to skim the vessels' daily earnings. (Oskirko Decl. at ¶¶ 6, 12). The fake charters and this fraudulent scheme had a continuing impact on the vessels' operations, earnings and movements throughout the life of the charter party contracts which were performed. (Amended Comp. at ¶¶ 15, 24, 36, 42-49, 54). Defendants' effort to paint this transaction and fraud as being limited solely to land- based activity bears no resemblance to the reality of the situation. If a claim involving fake charters, skimmed hire, and fraudulent control of vessels plying the high seas for years does not provide the Court with a viable case under admiralty tort and contract jurisdiction, one would have to question when such jurisdiction would ever exist.

**LEGAL ARGUMENT**

**POINT I**

**THE REQUIREMENTS OF RULE B ARE MET, AS DEFENDANTS CANNOT BE FOUND IN THIS DISTRICT AND PLAINTIFFS HAVE STATED VALID MARITIME CLAIMS AGAINST DEFENDANTS.**

A.    **The Requirements of Rule B.**

Supplemental Admiralty Rule B states in relevant part:

> (a)  If a defendant is not found within the district when a verified complaint praying for attachment and the affidavit required by Rule B(1)(b) are filed, a verified complaint may contain a prayer for process to attach the defendant's tangible or intangible personal property -- up to the amount sued for -- in the hands of garnishees named in the process.

> (b)  The plaintiff or the plaintiff's attorney must sign and file with the complaint an affidavit stating that, to the affiant's knowledge, or on information and belief, the defendant cannot be found within the district. The court must review the complaint and affidavit and, if the conditions of this Rule B appear to exist, enter an order so stating and authorizing process of attachment and garnishment. The clerk may issue supplemental process enforcing the court's order upon application without further court order.

> \*        \*        \*        \*

Fed. R. Civ. P. Supp. R. B(1)(a)-(b).

When an action is filed and a plaintiff seeks the initial issuance of an order of attachment, the order must be issued upon a *prima facie* showing by the plaintiff that the requirements of Rule B are met. *See Ullises Ship. Corp. v. FAL Shipping Co. Ltd.*, 415 F. Supp.2d 318, 322 (S.D.N.Y. 2006) (citing *Seaplus Line Co. v. Bulkhandling Handymax, AS*, 409 F. Supp. 2d 316 (S.D.N.Y. 2005)); *Deiulemar Compania Di Navigazione*, 2005 U.S. Dist. LEXIS 40783 (noting the ease with which Rule B is used). That is, a plaintiff must state that (1) it has a valid *prima facie* admiralty claim against the defendant; (2) the defendant cannot be found within the district;

(3) the defendant's property may be found within the district; and (4) there is no statutory or maritime law bar to the attachment. *Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.,* 460 F.3d 434, 445 (2d Cir. 2006).

Once property has been restrained, and if a person "claiming an interest" in the attached property challenges an attachment, the plaintiff must then demonstrate that a reasonable basis/probable cause exists for finding the requirements of Rule B satisfied. *See Ullises,* 415 F. Supp. 2d at 322-23; *Wajilam Exports (Singapore) Pte Ltd. v. ATL Ship,* 2006 AMC 2744 (S.D.N.Y. 2006). In such a context, the court's review is not limited to the adequacy of the allegations in the complaint, and the court may consider documents, affidavits, or testimony. *Maersk, Inc. v. Neewra, Inc.,* 443 F.Supp.2d 519, 527 (S.D.N.Y. 2006); *Linea Naviera de Cabotaje, C.A. v. Mar Caribe de Navigacion, C.A.,* 169 F.Supp.2d 1341, 1357-59 (M.D. Fl. 2001) (court not restricted to review of adequacy of complaint once attachment is challenged).

In the instant case, whether the minimal *prima facie* standard for issuance of an order of attachment is applied or the reasonable grounds standard utilized after an attachment has been challenged is applied, the result is the same – the requirements for Rule B have been satisfied. Defendants do not dispute, nor could they, that (1) they are not found in the district, (2) their property may be found within the district, and (3) there is no bar to the issuance of an attachment over their property.[5] The only issue which has been raised is whether Plaintiffs have asserted a valid maritime claim against Defendants, and as demonstrated below, Plaintiffs' Amended

---

[5] The Affidavit of Pamela L. Schultz submitted to the Court with the *ex parte* application on November 7, 2004 demonstrates that none of the defendants can be found in the district within the meaning of Rule B. The fact that funds to or from Defendants have been transferred through this district and restrained demonstrates that their property may be found within the district. (Gutowski Aff. ¶10). Finally, there is no statutory or maritime law bar to the issuance of an attachment, such as the immunity which exists for assets of foreign sovereigns.

Complaint adequately states valid maritime causes of action against Defendants sounding in both tort and contract.[6]

**B.     Plaintiffs' Amended Complaint States A Valid Maritime Tort Claim for Fraud Relating to the Charter of Ocean-Going Vessels.**

Historically, the determination of whether a tort is maritime depended upon application of a "locality" test. *See, generally, Sisson v. Ruby*, 497 U.S. 358, 360 (1990) (citing *The Plymouth*, 70 U.S. 20 (1866)). Under this test, the primary focus was whether the tort occurred on navigable waters. In *Executive Jet Aviation, Inc. v. City of Cleveland*, 409 U.S. 249 (1972), the Supreme Court moved away from a strict locality test and indicated that the emphasis should be placed on whether the alleged wrong bore a significant relationship to traditional maritime activity.

> *Executive Jet* marked this Court's first clear departure from the strict locality test .... Noting "significant difficulties with the locality test", we refused to enter into a debate over whether the tort occurred where the plane had crashed and been destroyed (the navigable waters of Lake Erie) or where it had struck the sea gulls (over land). Rather, we held that jurisdiction was lacking because "the wrong [did not] bear a significant relationship to traditional maritime activity."

*Sisson*, 497 U.S. at 360-61 (discussing and quoting *Executive Jet's* introduction of a nexus component to the jurisdiction test) (internal citations omitted). As the Supreme Court recognized,

---

[6] Plaintiffs maintain that the original complaint and application for an attachment under Rule B were properly supported. *See supra* note 2. Plaintiffs have also sufficiently supported the amount sought to be attached. In the Rule B context, the plaintiff need only demonstrate a reasonable basis for the calculation of its claim. *Dongbu Express Co. v. Navios Corp.*, 944 F. Supp. 235, 237 (S.D.N.Y. 1996) (citing *Bergesen v. Lindholm*, 760 F. Supp. 976, 986 (D. Conn.. 1991); *Rolls Royce Ind. Power (India) v. M/V FRATZIS M.*, 1996 A.M.C. 393, 402 (S.D.N.Y. 1995). Here, and based upon the Declaration of Michelle Jacqueline Linderman (Ex. 2 to Gutowski Aff.), Plaintiffs have adequately supported the amount sought to be attached.

> in determining whether there is admiralty jurisdiction over a particular tort or class of torts, reliance on the relationship of the wrong to traditional maritime activity is often more sensible and more consonant with the purposes of maritime law than is a purely mechanical application of the locality test.

*Executive Jet*, 409 U.S. at 261; *see also Foremost Ins. Co., v. Richardson*, 457 U.S. 668 (1982) (approving a broader interpretation of *Executive Jet* and clarifying that the nexus requirement applies in all maritime cases).

In the wake of these pronouncements, courts have since applied a two-part test in determining whether an exercise of admiralty tort jurisdiction is appropriate in a given circumstance. A party seeking to invoke federal admiralty jurisdiction in respect to a tort claim is generally obliged to satisfy the following conditions: (a) connection with maritime activity (the "nexus" requirement) and (b) location. *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534 (1995); *Doe v. Celebrity Cruises*, 394 F.3d 891, 900 (11th Cir. 2004). However, the more recent authority indicates that while locality is still considered, the real focus of the inquiry is trained on the question of whether the tort has a substantial relationship to some traditional maritime activity. *Doe*, 394 F.3d at 900; *Maritima Petroleo v. Ocean Rig 1 A.S.*, 78 F.Supp. 162 (S.D.N.Y. 1999) (whether the tort occurred on navigable waters is "not necessarily determinative."); *see also Executive Jet*, 409 U.S. at 259 (noting that "when a tort has no maritime locality, but does bear a relationship to maritime service, commerce or navigation then the tort is within the admiralty jurisdiction of the court).

Plaintiffs submit that this test should not be applied as rigidly as Defendants have suggested so as to deny an exercise of maritime jurisdiction in a case like this involving the traditional maritime activity of the chartering and operation of ocean going vessels. Indeed, the Supreme Court's most recent pronouncement on maritime jurisdiction reflects an expansive view of the contours of admiralty jurisdiction stating that "the shore is now an artificial place to draw

a line." *Norfolk Southern Railway v. James N. Kirby, Pty. Ltd.*, 543 U.S. 14, 25 (2004). Accordingly, and as explained below, the claims here satisfy both elements of the test for an exercise of maritime tort jurisdiction.

### 1.    *Plaintiffs' claims satisfy the nexus requirement.*

The nexus requirement involves an analysis of two factors:  (1) whether the "**general features** of the type of incident involved" had a "**potentially disruptive** impact on maritime commerce", and (2) whether the "**general character** of the activity giving rise to the incident bears a **substantial relationship to traditional maritime** activity." *Grubart*, 513 U.S. at 538; *see also Sisson*, 497 U.S. at 363.

The jurisprudence addressing the nexus requirement indicates that the courts have little difficulty in finding satisfaction of the two elements whenever the underlying claim involves some activity relating to traditional shipping.  *See, e.g., Doe*, 394 F.3d at 900 (first prong satisfied where claim involved activity by crewmember on cruise ship); *Exter Ship. v. Kilakos*, 310 F.Supp. 2d 1301, 1310 (N.D. Ga. 2004) (nexus exists because underlying misrepresentations affected movement of cargo and ships on high seas); *Elmwood Dry Dock v. H&A Trading Co.*, 1998 AMC 2681 (E.D. La. 1997) (nexus satisfied where alleged torts involved repair, maintenance and operation of ocean going vessel).

Applying these criteria to the instant case, there can be no reasonable debate that the activities by Defendants involved traditional maritime conduct.  Defendants created fake charter parties and entered into secret charter parties to position themselves to be able to skim from the hire paid in connection with the vessel's carriage of cargo. (Amended Comp. at ¶¶ 10-11, 15-16, 19, 21-28, 32, 36-37, 42-47).  There is no more fundamental maritime activity than the charter

and operation of ocean-going cargo ships.  *Morewood v. Enequist*, 62 U.S. 491 (1859); *Kirno Hill Corp. v. Holt*, 618 F.2d 982 (2d Cir. 1980).

In an attempt to support their argument that the nexus requirement is lacking in this case, Defendants rely on a string of cases which have no bearing on this fact pattern and are easily distinguished. (*See* Defendants' memorandum in support of their vacatur motion at p. 14).  Those cases are one-off situations where the plaintiffs were reaching for a basis to support a connection with traditional maritime activity when there clearly was none.  The cases include fact patterns involving a plane crash following a collision with birds, *Executive Jet*, 409 U.S. 358; a recreational sailboat owner's conversion claim, *Ramirez v. Butler*, 319 F.Supp.2d 1034 (N.D. Cal. 2004); a car accident on land, *Madison Coal*, 321 F.Supp.2d 809; a medical malpractice claim, *Rollin v. Kimberly Clark Tissue Co.*, 211 F.R.D. 670 (S.D. Ala. 2001); and a trucking accident involving the dumping of raw meat into a dried up river *Adventures Unlimited, Inc. v. Chrisman*, 208 F.Supp.2d 871 (E.D. Tenn. 2002).  It is no wonder that admiralty jurisdiction was lacking in these cases, but these cases have no bearing on a situation involving fraud in connection with multiple long-term time charter agreements and the operation of ocean-going tanker for years under a subterfuge whereby the defendants were able to secret out a significant amount of the hire which was being earned through the carriage of cargoes on the high seas.

### 2.    *Plaintiffs' claims similarly satisfy the location requirement.*

As outlined above, the second element of the test for admiralty tort jurisdiction involves a locality consideration.  While the test invites mechanical application in tort cases involving a physical injury or accident, the analysis is not so mechanical or geographic in cases involving intentional torts such as present here.  As outlined by Professor Schoenbaum,

> [I]n applying the locality rule to borderline situations, the courts hold that the
> tort occurs where the negligent or intentional act takes effect, not where the act

> occurred. Thus, if shots are fired from the land at a boat on navigable waters, the resulting tort is within admiralty jurisdiction. Intentional torts such as fraud, misrepresentation and fraudulent inducement to contract and defamation must have an effect on navigable waters to be within admiralty jurisdiction.

1 Thomas J. Schoenbaum, *Admiralty & Maritime Law* p. 99 (4th ed. 2004); *see also Harville v. Johns-Manville Prods. Corp.*, 731 F.2d 775, 782 (11th Cir. 1984) (under the locality test, the tort is deemed to have occurred not where the tort took place, but rather where the tortious act took effect).

In these types of situations, the courts have not drawn an artificial border at the shoreline with respect to whether admiralty jurisdiction exists. Obviously, to have done so would, of necessity, have divested the courts of jurisdiction in virtually every maritime fraud case unless the conspirators were in the same rowboat, so to speak, when they hatched their plan. Instead, the courts examine whether the tortious conduct had some impact on navigable waters or a vessel engaged in traditional maritime activity.

By way of example, in *Exter Shipping*, 310 F.Supp.2d 1301 (N.D. GA 2004) the court examined the issue of admiralty tort jurisdiction where the plaintiff alleged that the defendants had misrepresented the financial wherewithal of a charterer to perform charter party contracts. The defendants there (like here) argued that because the alleged fraud and misrepresentation took place on land where the charters were executed and because the impact of these torts included subsequent financial damage, the injuries were land-based thus precluding an exercise of admiralty jurisdiction. The court rejected that argument and found that by virtue of the misrepresentation, the vessels were chartered and cargo was carried and ultimately seized, thereby satisfying the locality criteria:

> Certainly, the alleged misrepresentations regarding ownership and disposition of the cargo which ultimately controlled the movement of the ships, the

discharge of their cargo, and their seizure by Metro Trading's creditors were injuries at sea. Therefore, the "situs" requirement has been met.

*Id.* at 1310;

The same can be said in this case. Without a doubt, it was the fraud perpetrated by the Defendants that enabled them to obtain the position of middle charterers and garner control of the vessels. That control enabled them to maintain the subterfuge that a direct contract with PDVSA was in existence, when in fact it was not, and skim the hire payments made in connection with the vessels performance and carriage of cargo. (*See* Amended Comp. at ¶¶ 46-55).

A similar situation was presented in *Elmwood*, 1998 AMC 2681. There, the plaintiffs alleged, *inter alia*, financial losses as a consequence of the defendant's conversion and misappropriation of funds which should have been used to operate and maintain a vessel. The Defendants argued that was a land-based tort because it was primarily involved with financial losses. The court disagreed and found that the conduct of the defendant in misappropriating the funds satisfied both aspects of the test for maritime tort jurisdiction because misappropriation had an effect on the vessel trading on navigable waters. "[E]very fact in this case [like the case at bar] and each alleged tort is connected to the vessel herself." 1998 AMC at 2692.

The First Circuit's decision in *Carroll v. Protection Maritime Ins. Co.*, 512 F.2d 4 (1st Cir. 1975), is also instructive. There, the plaintiff fishermen sued for tortious interference claiming that the defendant underwriters had black-listed them based upon the fact that they had previously asserted personal injury claims. Plaintiffs alleged that as a consequence they lost their current jobs and were unable to secure other employment. With respect to the locale analysis, the First Circuit noted that the location of the blacklisting was irrelevant, noting that "admiralty jurisdiction depends not on the place where the injury is inflicted but on the nature of

the service and its relationship to the operation of a vessel plying in navigable waters." *Id.* at 6. The court then concluded that interference with plaintiffs' shipping business, including handling of cargo and free operation of its vessels, as a consequence of the blacklisting, was sufficient to confer admiralty jurisdiction.

The lesson of all these cases is simple: If a fraudulent scheme or tortious conduct effects the management, operation or movement of a vessel at sea, an exercise of admiralty tort jurisdiction is proper because the acts have an impact on and bear a relationship to traditional maritime activity occurring on navigable waters. In the context of a time charter, the sole basis for the operation of the vessel is for the purpose of the carriage of cargo in exchange for the payment of hire or freight. Defendants' fraud here impacted directly on the operation, management, control and earnings of multiple vessels as they carried cargoes at sea. (Amended Comp. at ¶¶ 46-55). Defendants were, unbeknownst to Plaintiffs, the actual, secret charterers. They manipulated the charter documents so as to skim the hire paid in connection with the vessel's transport of cargo, diminished the vessels' earnings while secretly controlling the movements and trading pattern of the vessels under a scheme which left Novoship with the false impression that the charterer was PDVSA. (*See* Gutowski Aff. Ex. 3: Oskirko Decl.). Defendants' argument - that because the scheme also involved the transfer of money at banks on land - is far too artificial to deprive the Court of maritime jurisdiction in the circumstances of this case, and the authority cited above dispels the argument. Moreover, the cases indicate that the effect need only be potential in order to provide a basis for jurisdiction. Here, the effect was actual (they chartered the ships and controlled them) and potential (had there been a pollution incident or collision with a berth, the actual charterer [the Ruperti shell entities] would have had no financial wherewith to deal with those claims).

In *Cargill v. Esal (Commodities), Ltd.*, 1984 U.S. Dist. LEXIS 17839 (S.D.N.Y. 1984), Judge Knapp evaluated a similar jurisdictional issue involving a fraudulent bill of lading, a contract which also involves the transportation of cargoes at sea. The plaintiff alleged that the defendant had wrongfully exercised dominion and control over plaintiff's cargo by creating and presenting to a bank a fraudulent bill of lading (activities which necessarily could only occur on land) while the cargo was at sea. The court stated, "Defendant, through its agent, wrongfully exercised dominion and control over plaintiff's cargo and effected such conversion while the cargo was on navigable waters. Such conduct is a maritime tort and falls within our admiralty jurisdiction." 1984 U.S. Dist. Lexis at *3. There is no practical difference between a tort arising out of a fraudulent bill of lading and one arising out of a fake charter. As far as jurisdiction is concerned, the result should be the same. [7] This case is not, as Defendants would describe it, a mere "garden variety financial tort[s]" or "business tort[s]". No amount of editing can alter the fundamental admiralty nature of this fraud.

The case authority cited by Defendants (where jurisdiction was rejected) provides little support for their position given the marked difference between the fact patterns there and our situation. Defendants place great stock in the rejection of admiralty tort jurisdiction in *Kuehne & Nagel v. Geosource, Inc.*, 874 F.2d 283 (5th Cir. 1989), but fail to meaningfully address the fact that the fundamental reason why maritime jurisdiction was rejected there was because the alleged injury related to the failed *land based leg* of the combined transport of the cargo, not the ocean transport. The *Kuehne* court considered the admiralty jurisdiction issue in a mixed contract where the land-based portion involved over a thousand miles of trucking. The harm felt as a consequence of the alleged wrongful/fraudulent conduct (fraudulent inducement), however,

---

[7] *See also Malaysia Int'l v. Sinochem*, 436 F.3d 349 (3d Cir. 2006) (location test easily met based upon the defendant's alleged land-based misrepresentations to the Chinese Admiralty Court);

related primarily to that land based leg. As such, the court concluded that there was no impact on the water -- the water leg having essentially been completed.

> The fact that some of the cargo sat on the vessels is incidental to the forwarders' damages, most of which related to the added cost of the overland transportation. At best, the injury, if any, that occurred on navigable water was too remote from the tortious act to meet the situs requirement for admiralty jurisdiction.

874 F.2d at 289.

This case bears no resemblance to the facts of the claims at bar, which involve the fraudulent charters of ocean tankers, the loss of revenue in respect to the carriage of cargo on the high seas, and a scheme that unduly deprived the Plaintiffs of a legitimate and credit worthy charterer. There is no real land component, with the exception that the monies paid, or better stated not paid, moved through banks located on land. Unlike the losses felt in *Kuehne*, which stemmed from additional land based trucking charges, the losses here relate to lower hire rates being paid for cargo actually carried at sea pursuant to the charters. This, coupled with the continuing nature of the fraudulent operation necessary to maintain the control of the vessels by Defendants pursuant to the secret charter parties, was central to causing the damages suffered by the Plaintiffs and negate any application of the *Kuehne* rationale.

Likewise, the rationale underlying the court's rejection of jurisdiction in *Maritima Petroleo Engenharia Ltda. v. Ocean Rig I AS,* 78 F.Supp.2d 162 (S.D.N.Y. 1999) is inapplicable here. In that case, jurisdiction was rejected because the underlying contract (a MOA) was determined to be a mere preliminary contract, and not a maritime contract. Hence, since that agreement merely set the stage for further land based negotiations designed to perhaps later lead to a maritime contract, there was not and could not have been any impact on navigable waters.

The case of *Smith v. Mitlof,* 198 F.Supp.2d 492 (S.D.N.Y. 2002), does not support the Defendants' position either. The plaintiffs in *Smith* alleged that at the time of the sale of a

vessel, the seller was aware that it was dangerous and did not comply with federal regulations and that the failure to disclose this information constituted a tort. As in *Maritima*, the court first found that the underlying contract – sale of a vessel – was not a maritime contract and hence no admiralty tort jurisdiction existed over the claims of fraud and negligent misrepresentation which related to the non-maritime sale contract.

Finally, reliance on *In Re Madison Coal & Supply Co.*, 321 F.Supp.2d 809 (S.D. WV. 2003) is equally unpersuasive. *Madison Coal* involved an evaluation of admiralty tort jurisdiction in the context of an off-duty deckhand who, while intoxicated from consumption on shore, killed a person in a motor vehicle accident.

### 3. *A finding of admiralty tort jurisdiction would be consistent with recent Supreme Court pronouncements expanding maritime jurisdiction and the underlying policy of achieving uniformity in the maritime industry.*

In *Norfolk Southern Railway v. James N. Kirby, Pty. Ltd.*, 543 U.S. 14 (2004), the Supreme Court significantly expanded the scope of maritime contract jurisdiction. Here, cargo was being carried under a multimodal bill of lading contract of carriage which involved land and water transport. Although the injury complained of occurred during the land leg, the Court found maritime jurisdiction, noting that the key inquiry was whether the principal objective of the contract was maritime commerce: "So long as a bill of lading requires substantial carriage of goods by sea, its purpose is to effectuate maritime commerce – and thus it is a maritime contract." *Kirby*, 543 U.S. at 27.

With that decision, the "mixed contract" doctrine was substantially eroded if not swept away, and interestingly, had *Kuehne & Nagel* been decided after *Kirby,* the *Kuehne* court might well have felt compelled to exercise maritime jurisdiction. Such was the case in *Doe v. Celebrity*

*Cruises Inc.*, 394 F.3d 891 (11th Cir. 2004), where the Eleventh Circuit – following the Supreme Court's lead in *Kirby* - undertook a more expansive view on the bounds of maritime jurisdiction.

In *Doe*, admiralty tort jurisdiction was exercised even though the act (sexual assault by an off-duty crewmember against a passenger) occurred on shore. The court noted that although there was a temptation to draw bright lines rule between activities which occur on land and at sea in the jurisdictional analysis, where the overall situation is more "salty", courts should follow the more expansive view recently espoused by the Supreme Court in *Kirby* and not draw the "shore [as] an artificial place to draw a line." *Kirby*, 125 S.Ct. at 388.

Commentators equally support the view as set forth in *Kirby* that the concept of admiralty jurisdiction is changing and that the locality requirement should not be emphasized but rather subsumed into the nexus requirement, especially where the maritime interest is so strong that adherence to a strict locality rule would impede the fundamental purposes of admiralty jurisdiction.

> Whether a tort occurs on the water should be one factor to be considered in determining whether the tort meets the nexus requirement. The Admiralty Extension Act has helped by including damage done on land by vessels in navigable waters, and the courts have made an exception for seamen's claims arising out of their maritime status. As the courts are becoming accustomed to requiring a maritime nexus for tort claims as they have for contract claims, there seems to be no principled reason for excluding tort claims merely because they lack a maritime locale.

*1Benedict on Admiralty* § 171, p. 11-30-11-31 (7th ed. rev. by S. Friedel 1988) (citations omitted); *see also* Robert Force, *Determining Admiralty Tort Jurisdiction: An Alternative Analytical Framework*, 21 J. Mar. L & Com. 1, 78-80 (1990); Bederman, D. and Wierwille, J., *The Contemporary Contours of Admiralty Jurisdiction*, 31 Tul. Mar. Law J. 291, 295, 312 (2007)

(recognizing that the courts have been expanding the boundaries of admiralty jurisdiction to provide recourse to justice to individuals participating in maritime commerce).

In sum, Plaintiffs' amended complaint properly pleads an admiralty and maritime claim for fraud arising out of the creation, execution and performance of a maritime contract of charter party. The impact was felt on the water as the fraud enabled the Defendants to maintain the position as charterers of the vessels, facilitated the scheme by which the Defendants were able to diminish the earnings of the vessels for the actual carriage of cargo and placed Plaintiffs in the position of having an un-creditworthy charterer at the helm of their ships. The exercise of the Court's jurisdiction over Defendants' fraudulent conduct is warranted.

C.    **Plaintiffs' Amended Complaint States A Valid Maritime Claim for Breach of Obligations Under Maritime Charter Party Contracts.**

It cannot be disputed that charter parties are considered maritime contracts and that disputes relating to any such agreement fall within the federal court's admiralty jurisdiction. *See, e.g.*, Wilford, M., et al., *Time Charters* 56 (4th ed. 1995); 1 *Benedict on Admiralty*, §106, p.7-18 (6th ed. 1988) ("[m]ost transactions concerning or involving vessels are within admiralty jurisdiction, including 'any claim arising out of any agreement for the carriage of goods in a vessel or to the use or hire of a vessel.").

It also cannot be disputed that maritime contracts impose an obligation of good faith and fair dealing between the parties, and the failure of a party to honor that obligation gives rise to a claim for breach of contract. *FWF Inc. v. Detroit Diesel Corp.*, 494 F.Supp.2d 1342, 1369 (S.D. Fl. 2007) (citing *Misano di Navigazione SpA v. U.S.*, 968 F.2d 273, 274-75 (2nd Cir. 1992); Restatement (Second) of Contracts §205)). The duty to abide by the obligation of good faith and fair dealing is "imposed upon each party to the contract" *Restatement (Second) of Contracts* §205; *Cross & Cross Properties, Ltd. v. Everett Allied Co.*, 886 F.2d 497, 502 (2d Cir. 1989).

In the instant case, the time charter parties relating to the three vessels were, unbeknownst to Plaintiffs, contracts with the Ruperti shell entities. Those secret charter parties were an essential element to carrying out the fraud. In establishing and performing under these charter parties, Defendants breached their obligation of good faith and fair dealing inherent in all maritime contracts, both with respect to the inception of and during the performance of the contracts. (Amended Comp. at ¶ 56). As a result of Defendants' breach of the implied covenant of good faith and fair dealing, Plaintiffs Cally, Vital and Dainford have suffered damages in contract which clearly support admiralty contract jurisdiction. The Amended Complaint thus demonstrates a valid maritime claim against Defendants for breach of their contractual obligations.

### POINT II

### THE AMENDED COMPLAINT RELATES BACK TO THE FILING OF THE ORIGINAL COMPLAINT AND THUS THE ATTACHMENT OF THE FUNDS CURRENTLY RESTRAINED SHOULD BE MAINTAINED.

Pursuant to Federal Rule of Civil Procedure 15, Plaintiffs were entitled as a matter of course to file their Amended Complaint. *See* Fed.R.Civ.Proc. 15(a); *Barbara v. N.Y. Stock Exchange*, 99 F.3d 49, 56 (2d Cir. 1996) (noting that a motion to dismiss is not a responsive pleading within the meaning of Rule 15(a)). Under Rule 15(c), the claims asserted in the Amended Complaint relate back to the filing of the original complaint as they arise out of the conduct, transactions or occurrence set forth or attempted to be set forth in the original complaint and clarify the basis for an exercise of the Court's admiralty jurisdiction. *E.R. Squibb & Sons, Inc. v. Lloyd's & Companies Accident and Cas. Ins. Co.*, 241 F.3d 154, 163 ("it is widely accepted that amendments to cure subject matter jurisdiction relate back"); *Correspondent Serv. Corp. v. First Equities Corp. of Florida,* 338 F. 3d 119, 125 (2d Cir. 2003) (when an amended

complaint relates back, any jurisdictional defect is cured); *In Re Chaus Securities Litigation*, 801 F.Supp. 1257, 1264 (S.D.N.Y. 1992) (allegations that amplify the facts alleged in the original pleading or set forth those facts with greater specificity relate back); *Koal Ind. Corp. v. Asland S.A.,* 803 F.Supp. 1143, 1158 (S.D.N.Y. 1992) (amendment that changes only the legal theory of the action will relate back); *see also Moore's Federal Practice*, §15.19[2], Vol. 3 (3rd Ed. 2007). In this case, the underlying facts giving rise to this Court's admiralty jurisdiction, as set forth in the amended complaint were substantially detailed in the original complaint. (See Verified Complaint at ¶¶ 1-44; Amended Comp. at ¶¶ 1-45). The Amended Complaint merely amplified certain aspects of the impact those acts had on the management, control and operation of the vessels under the charters. (*See* Amended Comp. ¶¶ 50-56).

Because the Amended Complaint relates back to the filing of the original complaint, Plaintiffs submit that the order of attachment issued on the Amended Complaint should likewise relate back and the attachment maintained over the funds which were already restrained pursuant to the original order. *See Tide Line, Inc. v. Eastrade Commodities, Inc.*, 2007 AMC 252 (S.D.N.Y. 2006); *Correspondent Serv. Corp. v. First Equities Corp. of Fl.,* 338 F.3d 119, 125 (2d Cir. 2003).

In *Tide Line*, Judge Wood vacated a Rule B attachment on the basis that the original complaint did not state a *prima facie* claim against defendant Transclear, a party alleged to have been an alter ego of the other defendant. However, since the plaintiff had submitted a proposed amended complaint that sufficiently stated a *prima facie* case against Transclear, Judge Wood found that the purposes of Supplemental Rules B and E would not be served by vacating the

original attachment and therefore stayed the release of funds pending the issuance of a new attachment order and service of a new writ of attachment on the garnishee.[8]

In *Correspondent Serv.*, the district court vacated an attachment based on state law in connection with cross-claims lodged between the defendants because it believed it lacked jurisdiction over the main action when the attachment was granted.  The district court did not consider the allegations in an amended complaint which included an assertion of diversity jurisdiction.  The Second Circuit held on appeal that the district court should have considered the jurisdictional allegations of the amended complaint and determined whether the amended complaint related back to the original complaint, before dismissing the case and vacating the attachment.  The Second Circuit remanded the case to the district court for this assessment and noted that "[i]f the district court determines that jurisdiction over the action was proper under the diversity statute, it should reconsider its ruling with respect to the attachment as well." *Id.* at 126.[9]

---

[8]  The decision in *T&O Shipping, Ltd. v. Source Link Co., Ltd.*, 2006 U.S.Dist. Lexis 60700 (S.D.N.Y. 2006), provides no support to the contrary.  There, plaintiff filed suit and sought an attachment against party A.  Funds were restrained of a non-party with a similar name.  The plaintiff sought leave to hold the funds of the non-party while it filed an amended claim against that entity.  Judge Karas declined on the basis that the original complaint contained no allegations or notice that there was a claim against the non-party.  The court's decision appears to have also been influenced by the fact that plaintiffs counsel had directed the bank to restrain the funds against the non party even though they were not named in the process or the complaint.  In any event, none of those circumstances are present here and the case has no application to our situation where it was clearly stated in the original complaint that the matter involved an admiralty and maritime claim.

[9]  In *Correspondent Serv. Corp.*, the Second Circuit also discussed the standards which the district court should have applied before allowing a voluntary dismissal under Rule 41.  338 F.3d at 126-27.  The Second Circuit held that the district court should have weighed the prejudice that the attaching parties would suffer if they lost their attachment due to the voluntary dismissal of the action.  The prejudice discussion pertained to whether a voluntary dismissal should be allowed under Rule 41 and not to whether an amended complaint adding jurisdictional allegations related back to the filing of an original complaint such that property attached before the filing of the amended complaint should remain attached.

The latter is the issue presented in this case, and the Second Circuit's comments regarding the relation back of the amended complaint and directive to the district court to reconsider its ruling with respect to

In the same manner, since the Amended Complaint here elaborating on the Court's jurisdiction relates back to the original complaint, the attachment currently in place should be maintained. One of the rationales for the Rule B attachment procedure is to secure a claim in an international arena where assets can easily be moved out of a jurisdiction and hidden from creditors. It evens the playing field in securing claims so that a judgment on the merits will not prove to be meaningless. It is a remedy which, as a matter of public policy, should be generously afforded to victims of international frauds such as this committed by Defendants against Plaintiffs. Any other result would unduly prejudice the plaintiffs in a situation where the basis for the jurisdiction and thus the attachment has not changed.

## CONCLUSION

For the foregoing reasons, the order of attachment should be reinstated, it should relate back to the filing of the original complaint, the funds under attachment should continue to be restrained, and Plaintiffs should be authorized to recommence service of the process.


Dated:  December 19, 2007
        New York, NY

                                    Respectfully submitted,


                                    _____
                                    Peter J. Gutowski (PG 2200)
                                    FREEHILL HOGAN & MAHAR, LLP
                                    80 Pine St.
                                    New York, NY  10005
                                    Tel: (212) 425-1900
                                    Fax: (212) 425-1901


TO:   James L. Bernard
      Elizabeth A. Cronise

the attachment if the amended complaint related back indicates that the test for determining whether the funds restrained under the original complaint in this case should remain restrained is whether the Amended Complaint relates back to the original filing under Rule 15.

180 Maiden Lane
New York, NY  10038-4982
Tel: (212) 806-5400
Fax:  (212) 806-6006