486-07/PJG
FREEHILL HOGAN & MAHAR LLP
Attorneys for Plaintiffs
80 Pine Street
New York, NY 10005
(212) 425-1900
(212) 425-1901 fax
Peter J. Gutowski (PG 2200)
Gina Venezia (GV 1551)
Pamela L. Schultz (PS 8675)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NOVOSHIP (UK) LIMITED, CALLY SHIPHOLDINGS INC., VITAL SHIPPING CORPORATION, and DAINFORD NAVIGATION INC.,

       Plaintiffs,

 - against -

WILMER RUPERTI, SEA PIONEER SHIPPING CORPORATION, and PMI TRADING INC., JOHN DOE (fictitious) and JOHN DOE INC. (fictitious),

       Defendants.

07-CV- 9876 (DLC)

**PLAINTIFFS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF APPLICATION FOR RENEWAL OF ORDER OF ATTACHMENT AND IN RESPONSE TO DEFENDANTS' MEMORANDUM IN OPPOSIITON**

# **TABLE OF CONTENTS**

**PAGE**

TABLE OF AUTHORITIES ................................................................................................. i

INTRODUCTION AND SUMMARY OF ARGUMENT ON REPLY ..................................... 1

POINT I

PLAINTIFFS CORRECTLY STATED THE CURRENT TEST FOR
MARITIME TORT JURISDICTION WHICH IS MET IN THIS CASE. ................................. 2

    A.   The test for admiralty tort jurisdiction is not mechanically applied nor does it depend strictly on locale, and Defendants' continued urging of a pure mechanical application should be rejected. ................................................................................................... 2

    B.   Defendants' Actions Had an Effect on Navigable Waters... ............................... 4

    C.   The Activity Has a Clear Connection with Traditional Maritime Activity. ................................................................................................... 9

POINT II

THE BREACH OF THE CHARTERS PROVIDES AN INDEPENDENT
BASIS FOR THE EXERCISE OF ADMIRALTY CONTRACT
JURISDICTION. ................................................................................................................. 9

CONCLUSION ................................................................................................................... 10

# TABLE OF AUTHORITIES

**PAGE**

**Cases**

*Ari and Co., Inc. v. Regent Int'l Corp.*, 273 F.Supp.2d 518 (SDNY 1993) ..................10

*Broughton v. Florida Int'l Underwriters*, 139 F.3d 861 (11th Cir. 1998)..........................6

*Doe v. Celebrity Cruises Inc.*, 394 F.3d 891 (11th Cir. 2004) ...................................3, 4

*Erogov v. Terriberry*, 183 F.3d 453 (5th Cir. 1999)..................................................6

*Executive Jet Aviation, Inc. v. City of Cleveland*, 409 U.S. 249 (1972)....................3, 4

*Guidry v. Durkin*, 834 F.2d 1465 (9th Cir. 1987)......................................................7

*Harris v. Provident Life and Accident Ins. Co.*, 310 F.3d 73 (2nd Cir. 2002)..............10

*Int'l Terminal Op. Co. v. SS Valmas*, 375 F.2d 586 (4th Cir. 1967) ..............................8

*J. Lauritzen A/S v. Dashwood Shipping*, 65 F.3d 139 (9th Cir. 1995) ...........................5

*LaMontagne v. Craig*, 817 F.2d 556 (9th Cir. 1987)..................................................7

*LaMontagne v. Craig*, 632 F.Supp. 706 (N.D.Cal. 1986) ...........................................7

*Norfolk S. R. v. James N. Kirby, Pty. Ltd.*, 543 U.S. 14 (2004)....................................4

*Smith v. Mitlof*, 198 F.Supp. 2 Ct. 492 (S.D.N.Y. 2002)............................................5

*Solano v. Beilby*, 761 F.2d 1369 (9th Cir. 1985).....................................................6,7

*Watson v. Massman Construction*, 850 F.2d 219 (5th Cir. 1998) .................................7

*Whitcombe v. Stevedoring Servs.*, 2 F.3d 312 (9th Cir. 1993).......................................6

*Wiedemann v. Hollywood Marine*, 811 F.2d 864 (5th Cir. 1987) ..................................6

*In re Worldcom*, 456 F.Supp.2d 508 (S.D.N.Y. 2006) ..........................................9, 10

**Statutes**

46 U.S.C. §31341 ...................................................................................................................8

**Other Authorities**

1 Thomas J. Schoenbaum, *Admiralty & Maritime Law*, p. 99 (4th ed. 2004).................................4

Wilford, M., Coghlin, J. and Kimball, J., *Time Charters* 149 (4th Ed. 1995).............................7, 9

This reply memorandum is submitted on behalf of Plaintiffs in further support of their application for renewal of the Rule B attachment and in response to Defendants' memorandum in opposition (hereinafter "Opp.").

### INTRODUCTION and SUMMARY OF ARGUMENT ON REPLY

Defendants argue, *ad nauseum*, that this case presents the Court with little more than a "garden variety" land based commercial fraud, and as such, there is no admiralty jurisdiction. But as the saying goes, simply repeating something, over and over again, does not make it so.

In truth, this case is about as "salty" as it gets in the context of a charter party fraud claim. At bottom, it involves an individual who, through several shell companies, chartered a series of vessels under false pretenses, and then operated those vessels on the high seas as the putative "head charterer" for years so as to maintain the façade of a direct charter with PDVSA, all the while skimming the charter hire differential. That conduct constituted a breach of the charters themselves and a maritime fraud, both of which support admiralty jurisdiction.[1]

In support of its position that these supposed mere "commercial torts" do not give rise to maritime jurisdiction, Defendants make three arguments. First, they maintain that the locality test must be strictly applied, and since the conspirators were not at sea when they hatched their plan and reaped the dollar benefits of the scheme, admiralty jurisdiction does not exist. This is far too narrow a reading of the law, and illogical. (*See* Point I(A) below).

The same is true of Defendants' related argument that there was, supposedly, no effect on the water. That argument finds no support in the reality of how a charter works. Indeed, Defendants mis-apprehend the very nature of a time charter (wrongly suggesting that because the

---

[1] Indeed, if these actions do not support maritime jurisdiction, it is hard to imagine there could ever be a charter party fraud case that would. The end game in most frauds is the theft of money. Admittedly, there are no banks on the water. But that is not the test, nor does the test mandate that the monetary loss occur *on the sea*. That would be absurd. Rather, where the effect – here, the fraudulent operation of vessels under false pretenses – occurs at sea, there is clearly admiralty tort jurisdiction.

1

owner supplies the crew, the time charterer somehow does not control the movement of the vessel). Defendants also mischaracterize the relationship between an owner, under a head charter party, and a sub-charterer, under a sub-charter, suggesting that the sub-charterer somehow "stands in the shoes" of the main charterer and is thus bound to the terms of the head charter to which the sub-charterer is not a party. Such a characterization is just plain inaccurate. (*See* Point I(B) below).

Defendants next argue that the necessary connection to maritime activity is lacking and thus the connection prong is not satisfied. But Defendants ignore the fact that the "connection" prong of the jurisdiction test focuses on the "general character" of the relevant activity and not on the precise alleged actions. Here, the general character of the relevant activity is the chartering of vessels – clearly a traditional maritime activity. (*See* Point I(C) below).

Finally, Defendants argue that maritime contract jurisdiction does not exist because Plaintiffs have not asserted a stand-alone breach of contract. Defendants again miss the mark. There can be no more fundamental breach of a contract than the intentional concealment of the true identity of the contracting party. Plaintiffs' Amended Complaint aptly alleges Defendants' failure to identify the true charterer, and this fundamental breach supports the additional claim for the breach of the implied covenant of good faith. Accordingly, the Amended Complaint sufficiently sets forth a claim under the Court's maritime jurisdiction. (*See* Point II below).

## POINT I
### PLAINTIFFS CORRECTLY STATED THE CURRENT TEST FOR MARITIME TORT JURISDICTION WHICH IS MET IN THIS CASE.

**A.    The test for admiralty tort jurisdiction is not mechanically applied nor does it depend strictly on locale, and Defendants' continued urging of a pure mechanical application should be rejected.**

Plaintiffs' original memorandum contains a detailed discussion of the parameters of the test for admiralty tort jurisdiction. Plaintiffs fully and accurately described the development of

2

this test from its origins (as a strict locality analysis) to the current one which focuses on the relationship of the wrong to traditional maritime activity. Plaintiffs cited and quoted cases from the Supreme Court on the topic, provided examples of how other courts have applied the test, and cited well-known commentators who agree that locality alone is not dispositive on the issue of admiralty jurisdiction. (*See* Memo pp. 10-21).

In their opposition, Defendants assert that Plaintiff's have proposed what amounts to a "new" test, and that there is in fact no basis for anything but a rigid application of the locale analysis. Defendants argue that admiralty jurisdiction only exists where the tort occurs on the water or that an injury on land be caused by a vessel on the water. (Opp. pp. 8-9). Defendants' statement of the locality prong is too rigid and not reflective of the current state of the law.

As set forth in Plaintiffs' Memorandum, the Supreme Court has recognized that the more sensible approach to whether admiralty jurisdiction exists is the ***relationship of the wrong to traditional maritime activity*** as opposed to a "purely mechanical application of a locality test". *Executive Jet Aviation, Inc. v. City of Cleveland,* 409 U.S. 249, 261 (1972). In line with this rationale, courts have found the existence of maritime jurisdiction even in cases where the tort did not occur at sea. For instance, in *Doe v. Celebrity Cruises Inc.*, 394 F.3d 891 (11th Cir. 2004), the 11th Circuit agreed that an exercise of admiralty jurisdiction was appropriate in a case involving a sexual assault which admittedly occurred on shore. The 11th Circuit did not apply the circumscribed test advanced by Defendants (*i.e.* action at sea or no admiralty jurisdiction). The court instead looked at the practical reality and reasoned that although there was a temptation to draw a bright line in the jurisdictional analysis at the waterline, such a line would

not be consistent with the more expansive view of admiralty tort jurisdiction as developed through the Supreme Court's pronouncements.[2]

Thus, contrary to Defendants' suggestion, Plaintiffs have not misstated the test for admiralty tort jurisdiction. The law is now clear, and as set forth in Plaintiffs' main memorandum, the locality test is not applied in rigid mechanical fashion, and in many instances, "reliance on the relationship of the wrong to traditional maritime activity is often more sensible and more consonant with the purposes of maritime law than is a purely mechanical application of the locality test." *Executive Jet,* 409 U.S. at 261. As a consequence, intentional torts such as fraud give rise to maritime jurisdiction if they have an effect on navigable waters. 1 Thomas J. Schoenbaum, *Admiralty & Maritime Law*, p. 99 (4th ed. 2004).

**B.     Defendants' Actions Had an Effect on Navigable Waters.**

Recognizing the weakness of their strict locality argument, Defendants quickly move on to a lengthy discussion as to why their conduct had no effect on navigable water. (Opp. pp. 12-18). To support this position, they artificially narrow the scope of the scheme to only the end result - lost profits and unlawful payments – arguing that since monetary losses happen on land, such a fraud will not support admiralty jurisdiction. (Opp. p. 14). This argument ignores the reality of what drove those fraudulent gains (i.e. the creation of fake and secret charter parties which enabled Defendants to garner control of the operation, movement, and earnings of Plaintiffs' vessels on the high seas). (Amended Comp. ¶¶ 46-56; and Oskirko Decl. ¶¶ 7-10).

Defendants attempt to side-step this reality by suggesting that what amounts to the stealing of a vessel and its earnings is not effect enough. They suggest that as long as they did

---

[2] In their Opposition (p. 9), Defendants state that Plaintiffs failed to point out that *Norfolk S. R. v. James N. Kirby, Pty. Ltd.,* 543 U.S. 14 (2004), concerned maritime contract cases. Defendants are wrong. Plaintiffs specifically indicated that *Kirby* "expanded the scope of <u>maritime contract jurisdiction</u>". (emphasis added) (Memo. p. 19). Nonetheless, as specifically recognized by the 11th Circuit in *Doe*, the expansive view espoused by the Supreme Court in *Kirby* supports a more expansive view of maritime tort jurisdiction as well. Citing *Kirby*, the *Doe* Court recognized that the "shore is now an artificial place to draw a line". *Doe,* 394 F.2d at 901.

4

not cause a physical casualty, such as a grounding of the vessel at some unsafe port or a bunker spill during loading, they are otherwise free to steal the profits from their fraudulent operation of the vessels at sea, because the theft of money involves banks on land thus placing them comfortably outside the reach of this Court's admiralty jurisdiction. Such a construction of admiralty fraud tort jurisdiction would essentially deprive the Court of the power to hear most fraud cases, and ignores the reality that this fraud included, as an essential element, the operation and chartering of ships at sea.

Notably, none of the cases cited by Defendant for the proposition that the alleged injury must take place on water involves maritime fraud, and after unraveling their string cite of cases (which bear little, if any factual similarity to the maritime fraud claims here), the fallacy in Defendants' argument becomes clear.

*J. Lauritzen A/S v. Dashwood Shipping*, 65 F.3d 139 (9th Cir. 1995) does not, as Defendants claim, involve consideration of whether admiralty tort jurisdiction existed in respect to whether shipping routes or vessel operations were affected by the alleged tortious interference with a vessel pooling agreement.

In *Lauritzen*, there was a pooling agreement among several vessel owners which provided that the sale of a vessel could only occur to an existing pool member or one approved by the pool. One of the members sold its vessel to the Defendant Dashwood, who was neither approved nor a member of the pool. The issue which the Court considered was whether Dashwood's election to enter into that vessel purchase agreement intentionally, and with knowledge of the prohibitions within the pool agreement, constituted a maritime tort.[3] Determining that Dashwood's consideration of buying the vessel and its actual purchase took place on land, it denied admiralty jurisdiction.

---

[3] Notably, a contract for the sale of a vessel, unlike a charter party, is a non-maritime contract. *Smith v Mitlof*, 198 F.Supp 2d. 492, 499 (S.D.N.Y. 2002).

5

Defendants cite the case suggesting that the court's focus insofar as admiralty jurisdiction was concerned involved interference with the trading and operation of the vessel, and hence its relevance here. That is a mischaracterization. While, in the facts, the Court discusses the Defendant's refusal to alter its trading instructions on the voyage underway when it bought the ship, the focus of the Court's inquiry concerning admiralty jurisdiction was limited to Dashwood's conduct in electing to buy the vessel in the face of the pool agreement prohibition – conduct which the Court considered occurred solely on land. The case has no application to our situation. Simply stated, it was not the refusal of the change of orders which was the tort, but rather the decision to buy the vessel. The decision to buy the vessel occurred on land.

The cases of *Erogov v. Terriberry*, 183 F.3d 453 (5th Cir. 1999) and *Wiedemann v. Hollywood Marine,* 811 F.2d 864 (5th Cir. 1987), involved tortious interference claims made by law firms who alleged interference with their ability to pursue their clients' claims on land. The defendants had secured resolution of the underlying claims without the involvement of the plaintiff firms, and the firms sought damages for their lost potential contingency fees. Both courts found no admiralty jurisdiction because the interference could not have been felt on navigable waters since the underlying contracts (legal services) were to be performed on land. Here, the charter parties, by their very nature, were to be performed on water.

*Broughton v. Florida Int'l Underwriters*, 139 F.3d 861 (11th Cir. 1998), does not help Defendants cause either since it involved an insured's claim against a broker who allegedly breached a statutory, land-based obligation to ensure the financial soundness of an underwriter and inform the insured before placing the cover. It has no bearing to our facts.

The cases of *Whitcombe v. Stevedoring Servs.,* 2 F.3d 312 (9th Cir. 1993) and *Solano v. Beilby,* 761 F.2d 1369 (9th Cir. 1985) are equally of no relevance. *Whitcombe* involved a suit by a shipper against a terminal operator for cargo damage which occurred on land, before the cargo

6

was ever loaded. The *Solano* court glossed over any substantive discussion of the location prong since it was obvious that prong was met in a case involving cargo damage on a ship's ramp during loading. Neither case has any application here.

The decisions in *LaMontagne v. Craig,* 817 F.2d 556 (9th Cir. 1987) and 632 F.Supp. 706 (N.D.Cal. 1986), are also equally irrelevant to the case at bar since they involve a defamation claim by a plaintiff after a crewmember wrote a letter onboard. Since there could be no defamation until the letter was published, and it was not published until it reached the plaintiff's employer on land in Hong Kong, the location test was not met. Likewise, in the other defamation case cited, *Guidry v. Durkin,* 834 F.2d 1465 (9th Cir. 1987), the court found the location test was met when the defendant wrote an allegedly libelous statement onboard and conveyed it to a telex operator onboard for transmission to the shore, placing publication at sea. Finally, *Watson v. Massman Construction*, 850 F.2d 219 (5th Cir. 1998) did not even apply the location test, but rather the Fifth Circuit *Kelly* test.

Defendants next try to discount the true effect their fraud had at sea by arguing that as a time charterer, they had no control over the vessels because the vessel owner supplied the crew. This makes absolutely no sense and belies an utter misapprehension of how a time charter contract operates. Under this form of charter, it is the charterer (not the owner) which directs where the vessel is to sail, what cargo is to be lifted, where it will be discharged, when it will bunker, etc. The crew is obliged to follow the charterer's instructions, and for purposes of cargo carriage, the master is considered in the employ of the time charterer. Wilford, M., Coghlin, J. & Kimball, J., *Time Charters* 300 (4th Ed. 1995) and Shelltime 4 Form, Cl. 2. In fact, here it was Defendants who issued the trading and sailing orders to Plaintiffs – a fact they do not dispute. (Amended Comp. ¶¶50-54). Defendants had and exercised total control over these vessels.

Finally, Defendants argue that there was no effect here because PDVSA (who was a sub-charterer at the end of the chain of the actual/secret charter parties) "stepped into the shoes" of the charterers above it. Defendants cite a single case for the proposition that a sub-charterer stands in the shoes of the chartererer and is bound to the terms of the charter party above him. *Int'l Terminal Op. Co. v. SS Valmas*, 375 F.2d 586 (4th Cir. 1967). The statement in that case on which Defendants rely has been taken wholly out of context, and does not even remotely represent the contractual relationship between the parties in a chain of charter contracts.

*SS Valmas* involved the issue of whether a stevedore who supplied services to a vessel at the request of a sub-charterer had a lien on the vessel. At the time of that case, the law (since changed) provided that a supplier of services was obligated to review the vessel's paperwork to determine whether the entity ordering the services had authority to create a lien.[4] In that case, the head charter contained a standard prohibition of lien clause, but the stevedore did not undertake its required due diligence. The question for the court therefore was whether the terms of the head charter (which the stevedore should have reviewed) deprived the sub-charterer of the authority to create a lien on the vessel. Analyzing this question, the court recognized that the charterer had no authority under the head charter to create a lien and that the charterer could convey no greater rights vis-à-vis a lien on the sub-charterer. In this context, the court stated "the subcharterer stands in the shoes of the charterer, and a subcharter party ... would incorporate by implication the terms of the time charter." 375 F.2d at 590.

*SS Valmos* has **never** been cited by any other court or other authority for the proposition that a sub-charterer stands in the shoes of a charterer and is bound to the terms of the head charter party. In this regard, the court's statements are an anomaly. Indeed, such a conclusion goes against the practice in the industry where different charters are used in a chain of charters

---

[4] The law has since been changed, and a supplier of necessary services to a vessel is no longer required to investigate the authority of the entity requesting the services, before a lien can be created. 46 U.S.C. §31341.

8

with the head charter containing warranties, arbitration clauses, and a host of other terms which bind the immediate charterer, but which have absolutely no impact on ensuing sub-charterers, who are instead bound by the terms of those separate sub-charter contracts. Wilford, M., Coghlin, J. and Kimball, J., *Time Charters* 149 (4th Ed. 1995) ("The sub-charter does not create a contractual relation between the owner and the sub-charterer, and will not relieve the charterer of any of its duties to the owner under the head charter").

### C. The Activity Has a Clear Connection with Traditional Maritime Activity.

Finally, the suggestion that this case does not involve or have a connection with traditional maritime activity does not require any real reply. This case involves the fraudulent charter and operation of ocean-going vessels and the skimming of freight. It gets no more maritime than that. *See* Plaintiff's Main Br. at 12-13.

## POINT II
## THE BREACH OF THE CHARTERS PROVIDES AN INDEPENDENT BASIS FOR THE EXERCISE OF ADMIRALTY CONTRACT JURISDICTION

In its final argument, Defendants suggest that there was no underlying breach of the charter so any breach of the covenant of good faith is not actionable. Defendants do not dispute there is an implied covenant of the duty of good faith and fair dealing in all maritime contracts but argue that there must be an underlying breach of contract claim in order to support a concomitant breach of the covenant.

At the outset, Defendants would have the Court overlook its breach in failing to identify the true and correct charterer. Can there be any more fundamental a breach than to conceal who the contracting party is?

Apart from this, Defendants' misread *In re Worldcom*, 456 F.Supp.2d 508 (S.D.N.Y. 2006) and it provides no support for it proposition. In *Worldcom*, this Court granted the plaintiff an opportunity to amend his complaint to identify stock purchases between June '99 (date

9

alleged misrepresentations had been made and October '00 (date stock was involuntarily sold to make margin calls). In permitting the opportunity to amend, this Court required the plaintiff to specify which contract provisions were breached, which he failed to do. Although the plaintiff did identify purchases, the claim was dismissed because there was no showing of a causal link between the misrepresentations and the loss.

*Worldcom* does not, as Plaintiffs state, stand as "black latter contract law" that a party must plead a stand alone breach of contract claim in order to have a claim for a breach of the implied covenant of good faith, *i.e.,* must state two causes of action. The breach of contract claim alleged by Plaintiffs is a single cause of action – breach of the implied covenant of good faith/fair dealing in failing to disclose the true identity of the charterer. Such a claim can stand alone. *Harris v. Provident Life and Accident Ins. Co.*, 310 F.3d 73, 80 (2nd Cir. 2002) (parties to an express contract are bound by an implied duty of good faith, but breach of that duty is merely a breach of the underlying contract.). *See also, Ari and Co., Inc. v. Regent Int'l Corp.*, 273 F.Supp.2d 518, 522 (SDNY 1993) (recognizing that a breach of an implied covenant of good faith and fair dealing is normally duplicative of a breach of contract claim).

## CONCLUSION

This Court has admiralty contract and tort jurisdiction. The Rule B attachment should be reinstated.

Dated: January 11, 2008
New York, NY

Respectfully submitted,

_____
Peter J. Gutowski (PG 2200)
FREEHILL HOGAN & MAHAR, LLP
80 Pine St.
New York, NY 10005
Tel: (212) 425-1900
Fax: (212) 425-1901

10

TO:   James L. Bernard
        Elizabeth A. Cronise
        180 Maiden Lane
        New York, NY  10038-4982
        Tel: (212) 806-5400
        Fax: (212) 806-6006