**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

NOVOSHIP (UK) LIMITED, CALLY
SHIPHOLDINGS, INC., VITAL SHIPPING
CORPORATIONS, and DAINFORD
NAVIGATION INC.,

                         Plaintiffs,

                      v.

WILMER RUPERTI, SEA PIONEER SHIPPING
CORPORATION, and PMI TRADING, INC.,
JOHN DOE (fictitious) and JOHN DOE INC.
(fictitious),

                         Defendants.

Case No. 07 Civ. 9876 (DLC)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION FOR RECONSIDERATION, PURSUANT TO LOCAL RULE 6.3,
OF THE COURT'S MARCH 19, 2008 ORDER OR, ALTERNATIVELY,
FOR REDUCTION OF THE AMOUNT OF ATTACHMENT,
PURSUANT TO FED. R. CIV. P. ADMIRALTY SUPP. R. E(6)**

Table of Contents

Page

I. SUMMARY OF ARGUMENT ........................................................................... 1

II. PROCEDURAL HISTORY............................................................................... 5

III. ARGUMENT.................................................................................................. 7

    A.  Standard of Review on Motions for Reconsideration.......................................... 7

    B.  Plaintiffs Bear the Burden of Proof that Admiralty Jurisdiction Exists, Including
        Which Law Applies to their Claims. .................................................................. 8

    C.  Plaintiffs Failed to Identify the Law Applicable to their Purported Breach of
        Contract Claim or to Satisfy the Prima Facie Requirements for their Claim. ...................... 9

    D.  Plaintiffs Have Made No Showing of Contract Damages. ................................. 12

IV. CONCLUSION .............................................................................................. 14

Table of Authorities

Cases

*Aqua Stoli Shipping Ltd. v. Gardner Smith PTY Ltd.*,
    460 F.3d 434 (2d Cir. 2006)............................................................................4, 8

*Carbotrade, S.p.A. v. Bureau Veritas*,
    99 F.3d 86 (2d Cir. 1996) ......................................................................................9

*Dracos v. Hellenic Lines Ltd.*,
    705 F.2d 1392 (4th Cir. 1983) ...........................................................9, 10, 11

*FWF Inc. v. Detroit Diesel, Corp.*,
    494 F. Supp. 2d 1342 (S.D. Fla. 2007) ...........................................................11

*Furness Withy (Chartering), Inc. v. World Energy Systems Associates, Inc.*,
    523 F. Supp. 510 (D.C. Ga. 1981) ....................................................................4

*GTS Industries, S.A. v. S/S Havtjeld*,
    887 F. Supp. 531 (S.D.N.Y. 1994), aff'd, 68 F. 3d 1531 (2d Cir. 1995) ........................11

*J.K. Int'l, Pty., Ltd. v. Agriko S.A.S.*,
    No. 06-CV-13259 (KMK), 2007 WL 485435 (S.D.N.Y. Feb. 13, 2007)..........................8

*Kenney v. New York City Department of Education*,
    No. 06 Civ. 5770(HB), 2008 WL 40166 (S.D.N.Y. Jan. 2, 2008).....................................7

*Lauritzen v. Larsen*,
    345 U.S. 571 (1953)..............................................................................................9

*Marine Overseas Services, Inc. v. Crossocean Shipping Co., Inc.*,
    791 F.2d 1227 (5th Cir. 1986) ..........................................................................11

*Northern Tankers Cyprus Ltd. v. Lexmar Corp.*,
    781 F. Supp. 289 (S.D.N.Y. 1992)..............................................................11, 12

*OGI Oceangate Transp. Co. Ltd. v. RP Logistics PVT. Ltd.*,
    No. 06 Civ. 9441(RWS), 2007 WL 1834711 (S.D.N.Y. June 6, 2007) ......................9, 11

*Polar Shipping Ltd. v. Oriental Shipping Corp.*,
    680 F.2d 627 (9th Cir. 1982) .............................................................................4

*Ramirez v. Butler*,
    319 F. Supp. 2d 1034 (N.D. Cal. 2004) ...........................................................8

*Ronda Ship Management Inc. v. Doha Asian Games Organising Committee*,
    511 F. Supp. 2d 399 (S.D.N.Y. 2007)..............................................................13

*SMT Shipmanagement & Transport Ltd. v. Maritima Ordaz C.A.*,
 Nos. 00 Civ. 5789, 00 Civ. 6352, 01 Civ. 0013, 2001 WL 930837
 (S.D.N.Y. Aug. 15, 2001) ...............................................................................4

*Sea Transport Contractors, Ltd. v. Industrial Chemiques du Senegal*,
 411 F. Supp. 2d 386 (S.D.N.Y. 2006)...........................................................14

*Seawind Compania, S.A. v. Crescent Line, Inc.*,
 320 F.2d 580 (2d Cir. 1963)..............................................................................4

*Smith v. Mitlof*,
 198 F. Supp. 2d 492 (S.D.N.Y. 2002).............................................................8

*Staronset Shipping Ltd. v. North Star Navigation Inc.*,
 659 F. Supp. 189 (S.D.N.Y. 1987)..................................................................4

*Swift & Co. Packers v. Compania Colombiana del Caribe*,
 339 U.S. 684 (1950)..........................................................................................4

*T & O Shipping, Ltd. v. Source Link Co., Ltd.*,
 No. 06-CV-7724(KMK), 2006 WL 3513638 (S.D.N.Y. Dec. 5, 2006) ...........8

*Transportes Navieros y Terrestes, S.A. de D.V. v. Fairmount Heavy Transp., N.V.*,
 No. 07 CV 3076(LAP), 2007 WL 1989309 (S.D.N.Y. July 6, 2007) ...............13

*Winter Storm Shipping, Ltd. v. TPI*,
 310 F.3d 263 (2d Cir. 2002)..............................................................................4

*In re WorldCom Inc. Securities Litigation*,
 456 F. Supp. 2d 508 (S.D.N.Y. 2006)...........................................................11

Statutes

28 U.S.C. 1404 ....................................................................................................4

Federal Arbitration Act, 9 U.S.C. § 8 ..................................................................4

48 Am. Jur. Proof of Facts 3d 329 § 2 ...............................................................10

70 Am. Jur. 2d Shipping § 209 ..........................................................................11

2 Thomas J. Schoenbaum, *Admiralty & Maritime Law* § 11-17 (4th ed. 2008)............................12

26 *Williston on Contracts* § 69:2 (4th ed. 2007)................................................10

13 *Williston on Contracts* § 37:19 (4th ed. 2007)..............................................13

Defendants Wilmer Ruperti ("Ruperti"), Sea Pioneer Shipping Corporation ("Sea Pioneer") and PMI Trading, Inc. ("PMI") (collectively, "Defendants") make a restricted appearance pursuant to Fed. R. Civ. P. Admiralty Supp. R. E(8), and respectfully submit this Memorandum of Law in Support of their Motion for Reconsideration, Pursuant to Local Rule 6.3, of the Court's March 19, 2008 Memorandum Opinion and Order (hereinafter, the "March 19 Order") or, alternatively, for a reduction of the amount of attachment, pursuant to Fed. R. Civ. P. Admiralty Supp. R. E(6). In its March 19 Order, the Court found that admiralty contract jurisdiction exists in this case with regard to the breach of implied covenant of good faith and fair dealing claim asserted by plaintiffs Novoship (UK) Limited, Cally Shipholdings, Inc., Vial Shipping Corporation, an Dainford Navigation, Inc. (hereinafter, "Plaintiffs"). For the reasons stated herein, Defendants respectfully request that this Court reconsider its ruling and deny Plaintiffs' Motion for Renewal of Order of Attachment Pursuant to Supplemental Admiralty Rule B. Alternatively, Plaintiffs request that the amount of the attachment be reduced from $17,149,420 to zero.

## I. SUMMARY OF ARGUMENT

In their First Amended Verified Complaint ("Amended Complaint"), Plaintiffs allege that they have commenced an action against Defendants in the High Court of Justice, Queen's Bench Division, Commercial Court in London based on the same allegations advanced in their complaint here, and "specifically reserve the right to pursue the merits of their claim in the London lawsuit." (Amended Complaint ¶ 57). Plaintiffs further allege that the instant lawsuit was "brought to obtain security in favor of Plaintiffs for their claims against the Defendants in aid of the London lawsuit and to obtain jurisdiction over the Defendants for enforcement purposes." (Amended Complaint ¶ 58). Also, Plaintiffs allege that "this action is further brought to obtain security for any additional sums to cover Plaintiff's anticipated attorney fees

and costs in the London lawsuit and interest, all of which are recoverable as part of Plaintiffs' claims under English law." (Amended Complaint ¶ 58).

Despite their contention that the instant action was instituted for the purpose of obtaining security for claims they have asserted in the London lawsuit, Plaintiffs have not provided copies of their pleadings in London in this proceeding.[1] This Court, along with Defendants, has had to rely on Plaintiffs' characterization of their claims in the London lawsuit for which they seek an attachment here. After considerable effort and investigation, including consultation with two law firms in London, Defendants have finally obtained a copy of Plaintiffs' pleading in London (from an attorney representing another defendant in that litigation). Remarkably, Plaintiffs' Amended Particulars of Claim – their operative pleading in London[2] – contains no claim of a breach of the implied covenant of good faith and fair dealing, nor any breach of contract claim of any kind against Defendants.

In its March 19 Order, this Court did not find the existence of maritime tort jurisdiction here, but did find the existence of maritime contract jurisdiction based on Plaintiffs' allegation that Defendants breached the implied covenant of good faith and fair dealing under the alleged charter contracts between the parties. Specifically, this Court found that "the current record sufficiently demonstrates that plaintiffs have 'a valid prima facie admiralty claim against the defendants[s]' based on the breach of the charters." March 19 Order at 10. Upon that finding, the Court reinstated the original attachment and authorized Plaintiffs to seek attachment of

---

[1] Defendants have repeatedly brought this fact to light in their prior briefing. *See, e.g.*, Memorandum in Support of Motion to Vacate at 17 ("Plaintiffs do not furnish a copy of the alleged action commenced by them against Defendants in London . . . and do not assert the substantive law they claim to invoke"); Opposition to Renewal Motion at 3 n.2 ("Plaintiffs still have not furnished a copy of the alleged action commenced by them against Defendants in London or assert the substantive law they claim to invoke").

[2] *See* Affidavit of Michelle Jacqueline Linderman at ¶ 2 (identifying Amended Particulars of Claim as Plaintiff operative pleading in London action). Defendants respectfully request that the Court take Judicial Notice of Exhibit A hereto.

additional assets up to the total amount of $17,149,420, the sum that Plaintiffs claim to be seeking in the London lawsuit.

Because Plaintiffs' claim for breach of the alleged charter contracts was the only one found by this Court to constitute a "valid prima facie admiralty claim," the attachment remedy available to Plaintiffs is limited to that claim and to the amount of contract damages Plaintiffs can properly seek under it. However, no such breach of contract claim has been advanced in the London lawsuit despite Plaintiffs' contention that this action was filed to obtain security for its claims there. Plaintiffs' only claims against Defendants in London are the tort claims advanced in this lawsuit. Importantly, according to the Amended Particulars of Claim, no part of the alleged losses amounting to $17,149,420 relate to or arise out of a claim for breach of contract against Defendants. The entirety of the $17,149,420 amount arises out of the alleged tortious conduct Plaintiffs attribute to Defendants both here and in London.[3]

It follows that Plaintiffs have not shown that they have suffered any losses as a result of the alleged breach of the implied covenant of good faith and fair dealing that could support an attachment predicated on that claim. According to the Amended Particulars of Claim, the $17,149,420 sum reflects Plaintiffs' measure of their tort damages, plus the attorneys' fees they expect to incur in London prosecuting their tort claims there. Because no part of the $17,149,420 sum concerns contract damages or results from an alleged breach of the implied covenant of good faith and fair dealing, as Plaintiffs' own Amended Particulars of Claim makes clear, the attachment ordered by this Court upon its finding of maritime contract jurisdiction

---

[3]  In addition to attorneys fees and interest, which alone total $7,336,420, the sum of $17,149,420 represents the difference between what Plaintiffs allegedly received from the chartering of the vessels and what PDVSA allegedly paid during the same time period for the same vessels, plus the amount of three transfers allegedly made into a bank account of a company by the name of Pulley Shipping. Amended Particulars of Claim, ¶¶ 25(8), 25(5).9, 25(6).12, 25(7).6. Plaintiffs acknowledge that they were not contractually due these amounts. In fact, the fact that they were not is Plaintiffs' central complaint both here and in London.

cannot be based on that amount. Because Plaintiffs have not identified any other losses attributable to Defendants, particularly losses compensable in contract, Plaintiffs have failed to support any attachment whatsoever predicated on contract damages.

The absence of contract damages is consequential beyond the question of the availability or amount of a Rule B attachment in this case; without contract damages, Plaintiffs have no claim for breach of contract and this Court, as a result, has no maritime contract jurisdiction.[4] Putting aside the question of whether the implied covenant of good faith and fair dealing can be breached by a party who performs all of its obligations under a contract, as Plaintiffs have

---

[4] The absence of a contract claim in London, and particularly the absence of any reference in the Amended Particulars of Claim to a choice of venue or choice of forum clause pursuant to which Plaintiffs invoke the jurisdiction of the High Court in London, has further implications for the instant proceeding pending in New York. Absent a choice of venue or forum clause, Plaintiffs' assertion that they reserve the right to litigate the merits of this dispute in London deserves no deference. It is settled and elementary admiralty law that the attachment remedy has two purposes: to secure the defendant's appearance in the action and to assure satisfaction in case the suit is successful. *Swift & Co. Packers v. Compania Colombiana del Caribe*, 339 U.S. 684, 693 (1950). As the Second Circuit observed in *Seawind Compania, S.A. v. Crescent Line, Inc.*, 320 F.2d 580, 582 (2d Cir. 1963), "The two purposes may not be separated, however, for security cannot be obtained except as an adjunct to obtaining jurisdiction." It follows that the attachment remedy is generally not available to a plaintiff who does not seek to invoke it for the purpose of obtaining and exercising jurisdiction over an absent defendant.

There are three classes of cases were exceptions to this general rule have been applied. The first class involves cases where the attachment remedy is invoked in support of an agreement to arbitrate the underlying dispute. *Aqua Stoli Shipping Ltd. v. Gardner Smith PTY Ltd.*, 460 F.3d 434 (2d Cir. 2006) and *Winter Storm Shipping, Ltd. v. TPI*, 310 F.3d 263 (2d Cir. 2002) are examples. The availability of the attachment remedy in such cases derives from the Federal Arbitration Act which expressly authorizes the use of maritime attachments by parties to maritime contracts which contain arbitration clauses. *See* Federal Arbitration Act, 9 U.S.C. § 8. The second class of cases are those where parties to maritime contracts have agreed to the jurisdiction of a particular forum where disputes may be litigated. In *Polar Shipping Ltd. v. Oriental Shipping Corp.*, 680 F.2d 627 (9th Cir. 1982), the policy considerations that make available the attachment remedy in support of arbitrable disputes was extended to cases where the underlying controversy was subject to a forum selection or venue clause. Finally, the third class of cases involve multi-district litigation within the country initiated by plaintiffs looking to attach assets in the various jurisdictions in order to later seek a transfer of the action to the more convenient forum under 28 U.S.C. 1404. Examples of this class of cases include *Furness Withy (Chartering), Inc. v. World Energy Sys. Assocs., Inc.*, 523 F. Supp. 510 (D.C. Ga. 1981) and *Staronset Shipping Ltd. v. North Star Navigation Inc.*, 659 F. Supp. 189 (S.D.N.Y. 1987).

Based on the Amended Particulars of Claim, which makes no mention of a forum selection of venue clause, Plaintiffs preference that the merits of this dispute be litigated in London not only deserves no deference but, in addition, is incompatible with the attachment remedy it seeks here. This case does not fall into any of three classes of cases where courts have allowed an attachment only for purposes of obtaining security and not to exercise jurisdiction. *See, SMT Shipmanagement & Transp. Ltd. v. Maritima Ordaz C.A.*, Nos. 00 Civ. 5789, 00 Civ. 6352, 01 Civ. 0013, 2001 WL 930837 (S.D.N.Y. Aug. 15, 2001)(vacating attachment upon dismissal of lawsuit on *forum non conveniens* grounds because "security cannot be obtained except an adjunct to obtaining jurisdiction).

argued, such a breach does not become a justiciable cause of action unless damages result. Because there are no contract damages in this case, Plaintiffs have not stated, and cannot state, a cause of action for breach for breach of the implied covenant of good faith and fair dealing.

Finally, even assuming that Plaintiffs have shown that they possess a valid admiralty claim for breach of contract and that they suffered damages in some amount compensable in contract, which they have not, no resulting attachment can be directed to a defendant who was not a party to the contract alleged to have been breached. According to Plaintiffs' own allegations, the only defendant that was a party to a contract with them was PMI. (Amended Complaint ¶¶ 15, 19, 31 and 38). While Plaintiffs contend that those contracts were part of larger fraudulent scheme in which Sea Pioneer and Ruperti participated, Plaintiffs have advanced no theory that would entitle them to sue Sea Pioneer or Ruperti for breach of the PMI contracts, particularly when there is no allegation that PMI failed to meet its obligations to pay hire to Plaintiffs or to otherwise have breached any contractual obligation. Therefore, even if an attachment is allowed to stand for some amount, that attachment cannot be directed at either Sea Pioneer or Ruperti.

## II.  PROCEDURAL HISTORY

On November 7, 2007, Plaintiffs filed a Verified Complaint asserting that this case falls within the purview of maritime jurisdiction. Plaintiffs asserted that attachment was warranted in support of the London lawsuit. On the basis of that Verified Complaint, Plaintiffs requested and were granted an *ex parte* order permitting the maritime attachment and garnishment of Defendants' assets located in this jurisdiction.

On December 7, 2007, Defendants filed a motion to vacate that attachment due to the absence of facts supporting the existence of maritime jurisdiction. Plaintiffs opposed. During a December 14, 2007 hearing on that Motion to Vacate, this Court observed that the instant action

is not typical of the numerous maritime cases presented in this district and, further, that Plaintiffs' initial *ex parte* application for a maritime attachment was insufficient to warrant the maintenance of the November 7 Order and resulting process of maritime attachment and garnishment.  In an order dated December 17, 2007, this Court then directed that no additional funds should be attached under the November 7 Order, and granted Plaintiffs leave to make a renewed application for an order of attachment based on the Amended Verified Complaint ("Amended Complaint") Plaintiffs had filed shortly before the hearing.  At that time, the Court also denied Defendants' Motion to Vacate as moot.

Plaintiffs filed their Motion for Renewal of Order of Attachment Pursuant to Supplemental Admiralty Rule B ("Renewal Motion") on December 19, 2007, and the parties again briefed the issue of admiralty jurisdiction.  Throughout their Renewal Motion, Plaintiffs repeatedly claimed that they were asserting a breach of contract claim against Defendants and that jurisdiction should lie on that basis.  *See*  Mem. in Support of Renewal Motion at 21-22.  Plaintiffs further asserted that "[a]s a result of Defendants' breach of the implied covenant of good faith fair dealing, Plaintiffs Cally, Vital and Dainford have suffered damages in contract which clearly support admiralty contract jurisdiction."  *Id.*  Despite Plaintiffs' recognition in their Renewal Motion that contract damages are a necessary element of a breach of contract action, they failed to make any showing of contract damages in this case beyond this unsupported assertion.

On March 19, 2008, the Court issued a ruling granting Plaintiffs' Renewal Motion. Therein, the Court agreed with Defendants that there was likely no basis for the exercise of admiralty tort jurisdiction over Defendants.  March 19 Order at 6 n.1.  On the basis of Plaintiffs' assertions that their claims also included a breach of the implied covenant of good faith and fair

dealing, however, and their concomitant claim that this action was thus one sounding in admiralty contract jurisdiction in addition to admiralty tort jurisdiction, the Court granted Plaintiffs' Renewal Motion and found that the exercise of admiralty contract jurisdiction was appropriate here. The Court thus reinstated the $17,149,420 attachment requested by Plaintiffs.

Shortly before the Court's March 19 Order, and after repeatedly attempting to obtain the pleadings in the London litigation through various alternative means, Defendants' counsel were finally able to obtain, through counsel for another defendant in the London lawsuit, a copy of the Amended Particulars of Claim asserted by Plaintiffs in that action. As described above, there is not a single breach of contract claim asserted against Defendants in the London litigation, nor any claim for breach of the implied covenant of good faith and fair dealing. Rather, all of Plaintiffs' claims against Defendants in the London litigation sound in tort.[5] *See* Exhibit A hereto.

## III. ARGUMENT

### A.    Standard of Review on Motions for Reconsideration.

Motions for reconsideration fall within the discretion of the court and are governed by the standards set out in Local Civil Rule 6.3. *See, e.g., Kenney v. New York City Dep't of Educ.*, No. 06 Civ. 5770(HB), 2008 WL 40166, at *1 (S.D.N.Y. Jan. 2, 2008). To merit reconsideration, a movant must point to law or facts which it believes the court has overlooked. *See, e.g., id.* Relief is available to the extent that the court overlooked controlling law or factual matters that were put before it, or alternatively, where the movant demonstrates a clear error or to prevent manifest injustice. *Id.* (citing *Sequa Corp. v. GBJ Corp.*, 156 F. 3d 136, 144 (2d. Cir. 1998)).

---

[5]  In this regard, it is worth noting that Plaintiffs' counsel in this litigation contacted the undersigned to inquire whether Defendants' United States counsel would accept service of process in relation to the London litigation. Plaintiffs' counsel were informed that based on advice received from English counsel, only a solicitor admitted in the London court, with offices in London, could accept service of process in accordance with English law. To this day, Plaintiffs have not served the pleadings in the London lawsuit on Defendants.

**B.**     **Plaintiffs Bear the Burden of Proof that Admiralty Jurisdiction Exists, Including Which Law Applies to their Claims.**

When, as here, the question to be considered is one involving the jurisdiction of a federal court, "jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *Smith v. Mitlof*, 198 F. Supp. 2d 492, 498 (S.D.N.Y. 2002) (citing *Shipping Fin. Serv. Corp. v. Drakos*, 140 F.3d 129, 131 (2d. Cir. 1998)).   In evaluating whether admiralty jurisdiction applies, "[n]o presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Ramirez v. Butler*, 319 F. Supp. 2d 1034, 1037 (N.D. Cal. 2004).

As explained by the Second Circuit in *AquaStoli Shipping Ltd. v. Gardner Smith Pty, Ltd.*, 460 F.3d 434, 445 n.5 (2d. Cir. 2006), the Admiralty Rules "clearly place[] the burden on the plaintiff to show that an attachment was properly ordered and complied with the requirements of Rules B and E." *See also T & O Shipping, Ltd. v. Source Link Co., Ltd.*, No. 06-CV-7724 (KMK), 2006 WL 3513638, at * 2 (S.D.N.Y. Dec. 5, 2006); *J.K. Int'l, Pty., Ltd. v. Agriko S.A.S.*, No. 06-CV-13259 (KMK), 2007 WL 485435, at *2 (S.D.N.Y. Feb. 13, 2007). Therefore, in order to maintain the process of maritime attachment and garnishment under Rule B, Plaintiffs were required to demonstrate: (a) that they had a valid *prima facie* admiralty claim against each of the Defendants whose property they seek to attach; (b) that the Defendants could not be found within this district; (c) that the Defendants' property could be found within the district; and (d) that there was no statutory or maritime law bar to the attachment. *Aqua Stoli*, 460 F.3d at 445. "[A] district court must vacate an attachment if the plaintiff fails to sustain his burden of showing that he has satisfied the requirements of Rules B and E." *Id.*

### C.    Plaintiffs Failed to Identify the Law Applicable to their Purported Breach of Contract Claim or to Satisfy the Prima Facie Requirements for their Claim.

In a case such as this, involving conduct alleged to have occurred in various jurisdictions and parties that hail from different countries, a plaintiff's burden to show that it possesses a valid prima facie admiralty claim encompasses questions of choice of law.  A plaintiff must show that it possesses a valid prima facie admiralty claim under the law that will be applied to the dispute. As Defendants noted in their Motion to Vacate, *see* Mem. In Supp. of Defs. Motion to Vacate at 17 n.6, the factors that district courts consider when deciding questions of choice of law in admiralty include:  (1) the place of the wrongful act; (2) the law of the ship's flag; (3) the domicile of the injured party; (4) the domicile of the shipowner; (5) the place of the contract; (6) the inaccessibility of the foreign forum; (7) the law of the forum; and (8) the shipowner's base of operations.  *Carbotrade, S.p.A. v. Bureau Veritas*, 99 F.3d 86, 90 (2d Cir. 1996); *Lauritzen v. Larsen*, 345 U.S. 571, 583-92 (1953).  These factors are not exhaustive and are not to be applied mechanically.  *Dracos v. Hellenic Lines Ltd.*, 705 F.2d 1392, 1395 (4th Cir. 1983).

Plaintiffs in the case at bar have made no showing with regard to the substantive law that should be applied to this dispute, whether involving their purported tort claims or their purported contract claim.  Plaintiffs have simply ignored the issue even though Defendants addressed it in their very first submission to this Court.  Mem. In Support of Motion to Vacate at 17.  Courts have found that this failure by a plaintiff, without more, mandates the vacatur of a maritime attachment.  Absent a showing of applicable law, a plaintiff is deemed to have not met its burden under Rules B and E of showing that it possesses a valid prima facie admiralty claim – under the law that will govern the dispute.  In *OGI Oceangate Transp. Co. Ltd. v. RP Logistics PVT. Ltd.*, No. 06 Civ. 9441(RWS), 2007 WL 1834711, at *6 (S.D.N.Y. June 6, 2007), for example, the court vacated a maritime attachment because, *inter alia*, plaintiff had failed to meet its burden on

choice of law, and therefore failed to satisfy the requirements for the exercise of maritime
jurisdiction. In so holding, the court noted that:

> [w]ithout an understanding of the applicable law, the Court is
> unable to determine whether OGI has a valid prima facie claim . . .
> Since OGI has the burden of affirmatively showing that it has such
> a claim taking the strictest approach to this analysis and without
> more information, Plaintiff has failed to meet its burden . . . .

*Id. See also Dracos*, 705 F.2d at 1395 (plaintiff bears the burden of showing such facts as would
lead a court to choose the applicable law; "plaintiff's burden of proving jurisdiction was
principally a burden to show that the court must choose American law, for on its choice of law
its jurisdiction depended").

The recognition that a plaintiff's burden under Rules B and E includes an obligation to
plead and prove applicable law is important because in some respects the Court seems to have
placed that burden on Defendants in its March 19 Order. The Court's opinion indicates that the
Court found the existence of maritime contract jurisdiction in part because "Defendants make no
argument that New York (or even federal) law applies to plaintiffs' contract claim." March 19
Order at 9.[6]  In doing so, the Court held Defendants to a burden that was Plaintiffs' to bear.

---

[6]  The Court also rejected Defendants' argument that the breach of implied covenant claim was insufficient to
establish admiralty jurisdiction by holding that "[e]ven assuming the charter party contracts here permitted sub-
chartering, as defendants claim, plaintiffs' contract claim does not arise simply out of the fact that the Tankers were
sub-chartered by the defendants, but rather out of a deliberately deceitful and secretive course of alleged conduct in
both the formation and execution of the contracts." March 19 Order at 9-10.  In so holding, the Court described a
claim for fraudulent inducement, not a claim for breach of the implied covenant of good faith and fair dealing. *See,
e.g.*, 48 Am. Jur. Proof of Facts 3d 329 § 2 (2008) ("Fraud in the inducement requires that false representations of a
material fact have been communicated to the aggrieved party during the negotiations leading up to a contractual
agreement, that the false representations have been made knowingly and intentionally by the deceiving other party,
that the aggrieved reasonably relied upon the false representations in agreeing to the contract, and, generally, that the
aggrieved party has been damaged") (footnotes omitted); *see also* 26 Williston on Contracts § 69:2 (4th Ed. 2007).
Plaintiffs have pled no such claim.  Moreover, even if Plaintiffs had asserted a claim for fraudulent inducement, that
claim constitutes an intentional tort, and thus admiralty contract jurisdiction could not lie here.  *See, e.g.,* 26
Williston on Contracts § 69:2 ("Fraud is an intentional tort").  As the Court has already properly held, "it is far from
clear" that Plaintiffs could successfully make out a claim for admiralty tort jurisdiction here.  *See* March 19 Order at
6 n.1.

In addition to the legal inadequacies of Plaintiffs' allegations, Plaintiffs' repeated references to "fake" or "secret"
charter party agreements also belies the inadequacies of their asserted breach of the implied covenant of good faith

-10-

While a determination of applicable law in this case will require considerable factual development through discovery, including importantly review of the terms of the contracts Plaintiffs claim were breached, it remains the Plaintiffs' burden to show that they possess valid prima facie admiralty claims under the substantive law that will control the dispute. *See OGI Oceangate*, 2007 WL 1834711, at *6; *Dracos*, 705 F.2d at 1395.

Having side-stepped the choice of law question, Plaintiffs cited in their Renewal Motion to cases applying federal maritime contract law in support of the proposition that the implied covenant of good faith and fair dealing was applicable to maritime contracts. Federal maritime contract law, in turn, is made up of traditional commercial contract principles that are routinely applied by federal courts sitting in admiralty. *FWF Inc. v. Detroit Diesel, Corp.*, 494 F. Supp. 2d 1342 (S.D. Fla. 2007) ("It should, therefore, not come as a surprise to learn that general federal maritime law has adopted the general rules of contract interpretation and construction."); *GTS Industries, S.A. v. S/S Havtjeld*, 887 F. Supp. 531, 536 (S.D.N.Y. 1994), aff'd, 68 F. 3d 1531 (2d Cir. 1995) ("A charter party is merely a contract, subject to all the rules and requirements of contract law"); *Marine Overseas Servs., Inc. v. Crossocean Shipping Co., Inc.*, 791 F.2d 1227, 1234 (5th Cir. 1986) ("charter party agreements are essentially contracts and they are subject to the general rules of contract law").[7] Consistent with these authorities, Defendants cited to *FWF*, as well as to *In re WorldCom Inc. Sec. Litig.*, 456 F. Supp. 2d 508, 519 (S.D.N.Y. 2006), because both advance traditional contract principles. Under these authorities, Plaintiffs cannot show that

---

and fair dealing claim. *See, e.g.*, Mem. in Support of Renewal Motion at 6, 7. It is axiomatic that in order to establish a breach of charter party agreement, a plaintiff must establish that a valid charter party agreement actually exists. *See, e.g., Northern Tankers Cyprus Ltd. v. Lexmar Corp.*, 781 F. Supp. 289, 291 (S.D.N.Y. 1992) (part of plaintiffs' burden of proof is establishing the existence of a valid and existing charter party which defendant has breached). Plaintiffs are not permitted to claim that no valid charter party exists and simultaneously assert that its breach justifies the exercise of maritime contract jurisdiction in this case.

[7] *See also* 70 Am. Jur. 2d Shipping § 209 ("[d]amages for breach of a charter party are to be ascertained according to liberal principles of interpretation usually applied to commercial contracts").

they possess a valid prima facie admiralty claim for breach of contract under the general contract principles they invoked to decide the question.  Thus, maritime contract jurisdiction does not exist here, particularly where Plaintiffs' underlying claims in the London action assert no breach of implied covenant claim.

### D.    Plaintiffs Have Made No Showing of Contract Damages.

In order to successfully assert a maritime breach of contract claim such that the exercise of maritime jurisdiction would be appropriate here, Plaintiffs bear the burden of proof that they suffered damages resulting from that alleged breach.  *See, e.g., Northern Tankers Cyprus Ltd. v. Lexmar Corp.*, 781 F. Supp. 289, 291 (S.D.N.Y. 1992) (as is the case in any contract action, plaintiff bears burden of establishing a claim for damages based on breach of a charter party).  The measure of damages to be applied in charter party cases are based on recoverable damages for breach of contract; "the aggrieved party is to be placed in the same economic position he would have had if the contract were performed."  2 Thomas J. Schoenbaum, *Admiralty & Maritime Law* § 11-17 (4th ed. 2008).

No such damages exist in the instant case.  Plaintiffs' Amended Particulars of Claim makes clear that no part of the alleged losses amounting to $17,149,420 relate to or arise out of a claim for breach of contract against Defendants.  The entirety of the $17,149,420 amount arises out of the alleged tortious conduct Plaintiffs attribute to Defendants both here and in London.  Moreover, because the charter contracts were performed in full by PMI, Plaintiffs are now, without any intervention by this or any other court "in the same economic position [they] would have had if the contracts were performed. *Id.*

At most, in their Amended Complaint, Plaintiffs point to a series of speculative possibilities of damages that might have occurred related to the contracts at issue, but Plaintiffs have not asserted that <u>any</u> of those alleged risks actually materialized.  *See, e.g.*, Renewal Motion

at 6-7 (asserting that Plaintiffs were put at "substantial risk" of liability regarding the vessel's physical operation, risks of movement of oil cargoes and other risks, none of which are alleged to have actually occurred or resulted in damages). Plaintiffs have asserted no <u>actual</u> contract damages suffered as a result of their claimed breach. With regard to Sea Pioneer and Ruperti, Plaintiffs have not even alleged the existence of a contract with them.[8] As such, Plaintiffs cannot satisfy the elements of a breach of contract claim sufficient to satisfy admiralty contract jurisdiction because they cannot show any actual damages resulting from the purported breach. Defendants respectfully submit that allowing the March 19 Order to stand would constitute manifest injustice, and thus Defendants' Motion for Reconsideration should be granted.

Moreover, because only Plaintiffs' claim for breach of the alleged charter contracts was found by this Court to constitute a "valid prima facie admiralty claim," the attachment remedy available to Plaintiffs is limited to that claim and to the amount of contract damages Plaintiffs can properly seek under the charter party. An attachment must be reduced where the amount sought does not comport with the underlying claims at issue. *See, e.g., Ronda Ship Mgmt. Inc. v. Doha Asian Games Organising Comm.*, 511 F. Supp. 2d 399, 406 (S.D.N.Y. 2007) (attachment reduced; plaintiffs' claim did not assert breach of a particular charter party, and therefore attachment regarding that charter party was improper); *Transportes Navieros y Terrestes, S.A. de D.V. v. Fairmount Heavy Transp., N.V.*, No. 07 CV 3076(LAP), 2007 WL 1989309, at *5 (S.D.N.Y. July 6, 2007) (attachment reduced where plaintiff failed to produce evidence justifying total amount of damages and failed to mitigate damages). Where the allegations concern a breach of a charter party, attachment is only appropriate up to the amount of damages

---

[8] Plaintiffs may not assert a breach of contract claim against entities not a party to the contracts. *See, e.g.*, 13 *Williston on Contracts* § 37:19 (4th ed. 2007). Thus, admiralty jurisdiction and attachment is improper here as to Sea Pioneer and Ruperti, who were not parties to the charter agreements.

proscribed in the express terms of the contract concerning damages in the event of a breach. *See, e.g., Sea Transp. Contractors, Ltd. v. Indus. Chemiques du Senegal*, 411 F. Supp. 2d 386, 396 (S.D.N.Y. 2006) (reducing amount of attachment based on express terms in charter party governing breach of contract damages). Because Plaintiffs have failed to show an express breach of any charter party term here, and therefore can show no damages, the amount of the attachment should be reduced to zero.

## IV.  CONCLUSION

WHEREFORE, for the foregoing reasons, Defendants Wilmer Ruperti, Sea Pioneer Shipping Corporation and PMI Trading, Inc. respectfully request that this Court reconsider its March 19 Order, deny Plaintiffs' Renewal Motion and vacate the attachment and dismiss this action against Defendants for want of admiralty jurisdiction or, in the alternative, reduce the amount of the attachment to zero.

Respectfully submitted,


STROOCK & STROOCK & LAVAN, LLP


By: /s/ Elizabeth H. Cronise_____

    James L. Bernard (JLB-4273)
    Elizabeth H. Cronise (EC-7024)

    180 Maiden Lane
    New York, NY 10038-4982
    212-806-5400 (Telephone)
    212-806-6006 (Facsimile)

    Henry E. Mendia (*admitted pro hac vice*)

    200 South Biscayne Boulevard
    Miami, FL 33131-5323
    305-358-9900 (Telephone)
    305-789-9302 (Facsimile)

Attorneys for Defendants Wilmer Ruperti, Sea Pioneer
    Shipping Corporation and PMI Trading, Inc.

-15-

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 2, 2008, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notice of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notice of Electronic Filing.

## SERVICE VIA CM/ECF NOTICE OF ELECTRONIC FILING

**ERIC EINAR LENCK, ESQ.**
**PAMELA LYNN SCHULTZ, ESQ.**
**PETER JUDGE GUTOWSKI, ESQ.**
Freehill, Hogan & Mahar, LLP
80 Pine Street
New York, NY 10005
*Attorneys for Novoship UK Limited;*
  *Cally Shipholdings Inc.;*
  *Vital Shipping Corporation; and*
  *Dainford Navigation Inc.*

/s/ Elizabeth H. Cronise
Elizabeth H. Cronise

-16-

Exhibit A

**Amended Particulars of Claim by Order of the Honourable Mr Justice David Steel dated 6 November 2007**

**Re-Amended Particulars of Claim by Order of the Honourable Mr Justice Tomlinson dated 13 December 2007**

## IN THE HIGH COURT OF JUSTICE
## QUEEN'S BENCH DIVISION
## COMMERCIAL COURT

Claim No 2006 Folio 1767




B E T W E E N :

NOVOSHIP (UK) LIMITED

*1st Claimant*

CALLY SHIPHOLDINGS INC

*2nd Claimant*

VITAL SHIPPING CORPORATION

*3rd Claimant*

DAINFORD NAVIGATION INC

*4th Claimant*

TIMASHEVSK SHIPPING INC

*5th Claimant*

TAMAN SHIPPING INC

*6th Claimant*

TVER SHIPPING INC

*7th Claimant*

TROITSK SHIPPING INC

*8th Claimant*

— and —

VLADIMIR MIKHAYLYUK

*1st Defendant*

WILMER RUPERTI
(also known as WILMER RUPERTI PERDOMO and/or WILMER JOSE RUPERTI PERDOMO)

*2nd Defendant*

SEA PIONEER SHIPPING CORPORATION

*3rd Defendant*

PMI TRADING INC

*4th Defendant*

RE-AMENDED PARTICULARS OF CLAIM

1.05.4094.00.548078.v2

1

1    The First Claimant, Novoship (UK) Limited ('NOUK'), is a company registered in England with its registered office and principal place of business at Watergate House, 13-15 York Buildings, London WC2N 6JU. NOUK carries on business as a shipping manager. NOUK's issued share capital is held by Intrigue Shipping Inc, a Liberian registered company ("Intrigue"). Intrigue Shipping Inc is a wholly-owned subsidiary of Novorossiysk Shipping Company ('NSC'), a company which is incorporated in the Russian Federation and which is majority-owned by the Russian state.

1(1)  At all material times, NOUK acted as agent and manager for:

   1(1).1    the Second Claimant, Cally Shipholdings Inc, of 80 Broad Street, Monrovia, Liberia ('Cally Shipholdings'); Cally Shipholdings was, at the material times, the owner of the *Marshal Chuykov* and is a wholly-owned subsidiary of Intrigue;

   1(1).2    the Third Claimant, Vital Shipping Corporation, of 80 Broad Street, Monrovia, Liberia ('Vital Shipping'); Vital Shipping is and was, at the material times, the owner of the *Moscow Kremlin* and is a wholly-owned subsidiary of Intrigue;

   1(1).3    the Fourth Claimant, Dainford Navigation Inc of 80 Broad Street, Monrovia, Liberia ('Dainford Navigation'); Dainford Navigation is and was, at the material times, the owner of the *Moscow Stars* and is a wholly-owned subsidiary of Intrigue.;

   1(1).4    the Fifth Claimant, Timashevsk Shipping Inc, of 80 Broad Street, Monrovia, Liberia ('Timashevsk Shipping'); Timashevsk Shipping is and was, at the material times, the owner of the *Timashevsk* and is a wholly-owned subsidiary of Intrigue;

1(1).5   the Sixth Claimant, Taman Shipping Inc, of 80 Broad Street, Monrovia, Liberia ('Taman Shipping'); Taman Shipping is and was, at the material times, the owner of the *Taman* and is a wholly-owned subsidiary of Intrigue;

1(1).6   the Seventh Claimant, Tver Shipping Inc, of 80 Broad Street, Monrovia, Liberia ('Tver Shipping'); Tver Shipping is and was, at the material times, the owner of the *Tver* and is a wholly-owned subsidiary of Intrigue;

1(1).7   the Eighth Claimant, Troitsk Shipping Inc, of 80 Broad Street, Monrovia, Liberia ('Troitsk Shipping'); Troitsk Shipping is and was, at the material times, the owner of the *Troitsk* and is a wholly-owned subsidiary of Intrigue;

2   The First Defendant, Vladimir Mikhaylyuk ('Mr Mikhaylyuk'), was, from 18 October 2002 to 24 March 2006, employed by NOUK as its General Manager, pursuant to a written contract of employment dated 18 October 2002. Mr Mikhaylyuk had previously been employed by NOUK as its Deputy Chartering Manager and Commercial Manager. From 5 November 2003 to 24 March 2006, Mr Mikhaylyuk was a director of NOUK. Mr Mikhaylyuk was dismissed from his employment with NOUK on 24 March 2006 and ceased to be a director of NOUK on that date.

2(1)   The Second Defendant, Mr Wilmer Ruperti, is a Venezuelan businessman who at all material times owned or controlled the Third and Fourth Defendants. Further details in relation to these defendants are given in paragraph 25(1) below.

3   In his capacity as a director of NOUK and/or as the General Manager of NOUK, Mr Mikhaylyuk owed the following fiduciary duties to NOUK:

3.1   a duty to act in good faith and in the best interests of NOUK;

3.2     a duty not to act so as to place himself in a position in which his personal interests would conflict with the interests of NOUK;

3.3     a duty not to act for the benefit of himself or any third party without the informed consent of NOUK;

3.4     a duty not to make any secret profit or receive any secret payment from any third party with whom he was dealing on behalf of NOUK or otherwise;

3.5     a duty to account for any secret profit or secret payment;

3.6     a duty, upon request, to provide an account of all dealings and transactions undertaken by him as an employee and/or a director of NOUK on behalf of, or purportedly on behalf of, NOUK; and

3.7     a duty to return to NOUK, on the termination of his employment and/or directorship, all records, correspondence, files and other information belonging to NOUK or relating to NOUK's business.

Further, in his capacity as a director of NOUK and/or as General Manager of NOUK and by virtue of NOUK's acting as agent and manager for Cally Shipholdings, Vital Shipping. ~~and~~ Dainford Navigation, Shipping, Taman Shipping, Tver Shipping, and Troitsk Shipping, Mr Mikhaylyuk owed to each of Cally Shipholdings, Vital Shipping, ~~and~~ Dainford Navigation, Shipping, Taman Shipping, Tver Shipping, and Troitsk Shipping the same fiduciary duties as he owed to NOUK as set out in paragraphs 3.1 to 3.5 above *mutatis mutandis.*

4     Further or alternatively, the obligations set out in paragraph 3 above were implied terms of Mr Mikhaylyuk's contract of employment with NOUK. Clause 7.2 of that contract of employment provided:

'7.2    The Executive [*sc,* Mr Mikhaylyuk] shall devote to the Employer [*sc,* NOUK] the whole of his time and attention and shall use his best endeavours to promote the interests of the Employer during their normal working hours and beyond.'

In addition, Mr Mikhaylyuk's Job Description, which was annexed to his contract of employment, provided:

'1    The General Manager has the overall responsibility to optimise the net earnings of the Ships under management for the benefit of the principals.'

5    In breach of his fiduciary duties set out above and/or in breach of his contract of employment, Mr Mikhaylyuk demanded and/or accepted and/or arranged bribes and/or secret commissions and/or secret payments and/or made secret profits for himself and/or others in connection with NOUK's business and/or the business of NOUK's principals, including Cally Shipholdings, Vital Shipping, and Dainford Navigation, Timashevsk Shipping, Taman Shipping, Tver Shipping, and Troitsk Shipping. Particulars of these matters are set out below.

**The '*Tula*'**

6    IPC (USA) Inc ('IPC') is a company incorporated in the state of California with its principal business address at 333 City Blvd, West #650, Orange, California 92868. It carries on business as a wholesale distributor of diesel, gasoline, jet fuel and other petroleum products. Andorra Services Limited ('Andorra Services') is a Hong Kong shipping company with a registered address at Room 403, 4/F Printing House, 6 Duddell Street, Central, Hong Kong.

7    At about the beginning of 2004, Andorra Services was engaged in negotiations for the charter of a vessel called the *M/T Tula* ('the *Tula*'). The *Tula* was owned by Tula Shipping Inc (a Liberian single-ship company and a subsidiary of NSC) and was managed and operated by NOUK. The shipbroker involved in the negotiations was

Argent Shipping Limited ('Argent Shipping'), a company registered in England, with a registered address at 50 West Street, Farnham, Surrey, GU9 7DX and a place of business at 2nd Floor, Southern House, Flambard Way, Godalming, Surrey, GU7 1HH.

8    On or before 25 February 2004, Mr Mikhaylyuk instructed Mr Iain Rennie, of Argent Shipping, to inform the prospective charterers that unless they agreed to pay US$400 per day (into a bank account, details of which would be advised), the owner's management would not 'lift their subjects' in relation to the *Tula* (that is to say, the owner would not agree to a charterparty).

9    Andorra Services orally agreed with Mr Rennie that it would make the payments demanded by Mr Mikhaylyuk and the *Tula* was fully fixed under a time charter dated 25 February 2004 for a period of 24 months, plus or minus 15 days at the charterer's option.  By an addendum dated 4 June 2004, the charterparty was assigned from Andorra Services to IPC (then called Itochu Petroleum Corporation USA).

10   Andorra Services and/or IPC complied with Mr Mikhaylyuk's requirement for the making of payments of US$400 per day. NOUK will refer to the following facts and matters:

10.1  On a date which NOUK is unable to particularise, Mr Mikhaylyuk called Argent Shipping with bank account details for onward transmission to the charterers.

10.2  The bank account details were for a company called Mirador Shipping Inc ('Mirador Shipping') and were as follows:

> 'US Dollars to The Bank of Nevis International Ltd, Nevis
> Pay:            Federal Reserve Bank
> For Account:    The International Bank of Miami, NA
>                 121 Alhambru Plaza-Penthouse 2
>                 Coral Gables, Florida, 33134
> ABA No:         0670-01699

| Favour: | The Bank of Nevis International Ltd |
| --- | --- |
| | A/C #: 990000 420-06 |

| Final credit to: | A/C Name: | Mirador Shipping Inc |
| --- | --- | --- |
| | A/C #: | 8291982' |

Mirador Shipping is a company registered in the Island of Nevis. It was incorporated on 3 December 2002.

10.3 Andorra Services and/or IPC subsequently made payments to Mirador Shipping in accordance with Mr Mikhaylyuk's requirements. In support of that contention, NOUK will rely upon the fact that on 25 April 2006, whilst NOUK was negotiating an extension of the time charter in relation to the *Tula* (and after Mr Mikhaylyuk had ceased to be employed by NOUK, as pleaded above), NOUK received a message from Argent Shipping, sent on behalf of IPC, in the following terms:

'Please note it has been advised that Usd 400/day payable to Mirador Shipping Inc is no longer payable and is not payable from August 2004 onwards.'

(In the light of the payments set out in paragraph 11 below, which continued until 1 September 2005, NOUK will contend that the reference in this message to 'August 2004' was a typographical error.)

11 NOUK is unable, at present, to state the total amount of the payments made by Andorra Services or IPC to Mirador Shipping pursuant to the above agreement or arrangement. However:

11.1 the total amount included the following payments from IPC received in Mirador Shipping's bank account at the Bank of Nevis (before the deduction of bank charges):

| Date | Amount (US$) |
| --- | --- |

| 4 May 2004 | 24,385.00 |
|---|---|
| 25 May 2004 | 12,385.00 |
| 16 June 2004 | 11,985.00 |
| 26 July 2004 | 12,385.00 |
| 17 September 2004 | 24,400.00 |
| 13 December 2004 | 24,400.00 |
| 21 December 2004 | 12,400.00 |
| 21 February 2005 | 11,200.00 |
| 1 September 2005 | 24,800.00 |
| **Total:** | **158,340.00** |

11.2 if, as appears to have been the case from the fact that a payment was made in September 2005, the payments were made at the rate of US$400 per day from February 2004 to August 2005 (at the earliest), the total payments would have been some US$219,500; NOUK is not, at present, aware whether there were payments additional to those set out in paragraph 11.1 above or, if there were, where such payments were made.

12    The payments were arranged by Mr Mikhaylyuk and were made as bribes and/or secret commissions or payments and Mr Mikhaylyuk dishonestly and in breach of his duties pleaded above and in breach of his contract of employment solicited and received or diverted such payments for the benefit of himself and/or others whom NOUK is at present unable to identify and concealed such payments from NOUK. Prior to disclosure, NOUK will refer to the following:

12.1    NOUK and Tula Shipping Inc were at all material times unaware of the agreement or arrangement and unaware of the payments and neither NOUK nor Tula Shipping Inc authorised the agreement or arrangement or the payments.

12.2    Mirador Shipping provided no service in relation to the charter of the *Tula*. No contractual or other documentation has been found on NOUK's files which

explains, justifies or refers to the payments. Nor have the payments been accounted for to NOUK or to Tula Shipping Inc.

12.3    Further, Mr Mikhaylyuk:

12.3.1    required that the payments should be made as a condition for agreeing to the charterparty;

12.3.2    provided the bank account details for the payments;

12.3.3    did not place any record of the arrangement or payments on NOUK's files.

12.4    On 25 April 2006:

12.4.1    within an hour of the message referred to in paragraph 10.3 above being sent to NOUK, Mr Mikhaylyuk telephoned Argent Shipping (Mr Rennie) and asked Argent Shipping to 'withdraw the message'; Mr Rennie replied that Argent Shipping could not withdraw the message;

12.4.2    Mr Mikhaylyuk repeated his request to Mr Rennie later that day and on the following day;

12.4.3    on that day, or on the following day, Mr Mikhaylyuk met Mr Vladimir Lebedev, the new General Manager of NOUK, and asked that the message should not be passed to NSC.

As pleaded above, at this time Mr Mikhaylyuk was no longer employed by NOUK. NOUK will invite the Court to infer that Mr Mikhaylyuk was seeking to conceal the payments from NOUK and from its principals.

12.5 Mirador Shipping shares the same registered agent in Nevis (*sc,* Hamilton Trust Company (Nevis) Ltd ('Hamilton Trust')) as Pulley Shipping Limited ('Pulley Shipping') to which, as pleaded below, Mr Mikhaylyuk also secretly diverted monies. Further, Mirador Shipping and Pulley Shipping each holds an account at the Bank of Nevis International Limited and it was to that bank that the payments in each case were diverted (see paragraphs 10.2 above and 19 below).

12.6 By reason of the aforesaid matters, it is to be inferred that both Pulley Shipping and Mirador Shipping are controlled by Mr Mikhaylyuk and that the receipt by those companies of monies represented receipt by Mr Mikhaylyuk and/or by others and not for the benefit of NOUK. NOUK will further refer to the facts and matters pleaded in paragraphs 22 to 22(25) below.

13    By reason of the matters aforesaid, Mr Mikhaylyuk has acted in breach of his fiduciary and contractual duties as set out in paragraphs 3 and 4 above.

14    In the premises:

14.1 Mr Mikhaylyuk is liable to give an account to NOUK of all sums received by him or Mirador Shipping or others whom NOUK are unable to identify pursuant to the agreement or arrangements referred to above;

14.2 Mr Mikhaylyuk is liable to pay to NOUK the sums due on the taking of such account; and/or

14.3 Mr Mikhaylyuk is a constructive trustee for NOUK of the bribes and/or secret payments and/or secret profits for NOUK and NOUK is entitled to a declaration to that effect and to payment of such sums; and/or

14.4 NOUK is entitled to recover the bribes and/or secret payments and/or secret profit on the grounds of unjust enrichment or as monies had and received.

15    Further or alternatively, NOUK is entitled to damages and/or equitable compensation for breach of contract and/or breach of fiduciary duty. For the reason pleaded in paragraph 11 above, NOUK is at present unable to provide particulars of its loss (which is a matter within the knowledge of Mr Mikhaylyuk), but will do so after disclosure.

**Odin**

16    Odin Marine Inc ('Odin Marine') is a company registered in the state of Delaware with its registered address at Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801. Odin Marine operates from the state of Connecticut and has its principal place of business at 66 Gate House Road, Stamford, Connecticut, 06902. It carries on business as a shipbroker.

17    At all material times, Odin Marine acted as a shipbroker for for Stena Bulk AB of Masthuggskajen, SE-405 19 Gothenburg, Sweden and Stena Bulk LLC, a company registered in the state of Delaware with its registered address at 2711 Centerville Road Suite 400, Wilmington, Delaware 19808. Stena Bulk LLC acted as agent for Stena Bulk AB in the arrangement of the time charters referred to in paragraph 17(1) below. Stena Bulk LLC operates from the state of Texas and has its principal place of business at 2727 Allen Parkway Suite 760, Houston, Texas, 77019. Prior to 1 October 2004, Stena Bulk LLC operated under the name Stentex LLC and is referred to below as 'Stentex/Stena Bulk'.

17(1)    During 1999 and 2000, NOUK, arranged the following time charters of vessels operated and managed by NOUK to Stena Bulk AB:

17(1).1    on behalf of Timashevsk Shipping, a charter dated 17 December 1999 of the

*Timashevsk:* this charter was for an initial period of 3 months and was extended by addenda until 2 years after 16 July 2001;

17(1).2    on behalf of Taman Shipping, a charter dated 17 December 1999 of the *Taman*; this charter was for an initial period of 3 months and was extended until July 2003;

17(1).3    on behalf of Tver Shipping, a charter dated 17 December 1999 of the *Tver*; this charter was for an initial period of 3 months and was extended by addenda until 2 years after 23 June 2001;

17(1).4    on behalf of Troitsk Shipping, a charter dated 5 May 2000 of the *Troitsk*; this charter was for an initial period of 6 months and was extended by addenda until 2 years after 28 May 2001.

17(2)    Each of the time charters referred to in paragraph 17(1) above provided for the payment of commission as follows:

'A brokerage commission of 1.25 percent is payable by Owners to ODIN MARINE, INC and 1.25 percent to ACM SHIPPING LTD on all hire payments earned under this Timecharter Party.'

ACM Shipping Limited ('ACM Shipping') were brokers retained by NOUK and the owners in connection with the negotiations of the above time charters.

17(3)    By time charters dated 3 July 2003, each of the vessels referred to in paragraph 17(1) above was further chartered for a period of 18 to 24 months, at the charterers' option. Each such further charter was negotiated by Mr Mikhaylyuk with Mr Per Tetzlaff of Odin Marine.

17(4)    By virtue of such further charters, as Mr Mikhaylyuk and Mr Tetzlaff knew, ACM Shipping would continue to be (or would claim to continue to be) entitled to brokerage

commission of 1.25 per cent on all hire payments. However, Mr Mikhaylyuk and Mr Tetzlaff concealed the further charters from ACM Shipping Limited and arranged for each charterparty to provide for commission in the following terms:

'A total commission of 2.5% (Address commission and brokerage commission of 1.25% to Odin Marine, Inc) to be deducted from freight.'

17(5)   By time charters dated 7 April 2005, each of the vessels referred to in paragraph 17(1) above were further chartered for a period of 30 to 36 months, at Stena Bulk AB's option ("the 2005 Charters"). Each of the 2005 Charters was negotiated by Mr Mikhaylyuk with Mr Tetzlaff. Each of the 2005 Charters included provision for the payment of 1.25% address commission to be deducted from freight.

17(6)   Notwithstanding the terms of the charters as set out in paragraphs 17(4) and 17(5) above, the charterers, Stena Bulk AB, (as had been the case with the original charters) did not in fact require address commission. Further, Stena Bulk AB has advised the Claimants that it was not aware of the terms of the charters providing for payment of address commission and Stena Bulk AB has made no request that address commissions be paid. The 1.25 per cent address commissions were not paid to Stena Bulk AB or to their order, but were, so far as the Claimants are aware, retained by Odin Marine and/or passed elsewhere for the benefit of Mr Mikhaylyuk and/or others of whom the Claimants are unaware.

17(7)   It is to be inferred that Mr Mikhaylyuk knew that there was no intention on the part of Odin Marine to pay such address commissions to Stena Bulk AB and that he and Mr Tetzlaff arranged the terms set out above dishonestly and with the intention that such address commissions should be diverted from Timashevsk Shipping, Taman Shipping, Tver Shipping and Troitsk Shipping for the benefit of themselves (Mr Mikhaylyuk and Mr Tetzlaff) and/or Odin Marine and/or others of whom the Claimants are unaware.

17(8)   In acting as set out above, Mr Mikhaylyuk acted in breach of his duties to NOUK, Timashevsk Shipping, Taman Shipping, Tver Shipping and Troitsk Shipping set out in

paragraphs 3 and 4 above and/or conspired with Mr Tetzlaff to injure and defraud NOUK, Timashevsk Shipping, Taman Shipping, Tver Shipping and Troitsk Shipping.

17(9)     By reason of the aforesaid breaches of duty on the part of Mr Mikhaylyuk and/or by reason of the said conspiracy to injure and defraud:

17(9).1   NOUK has suffered loss and damage as follows:

17(9).1.1   ACM Shipping Ltd claimed against NOUK that it was entitled to commission on the time charters as set out in paragraph 17(4) above on the grounds that these charters were renewals.

17(9).1.2   In order to settle that claim, NOUK (on behalf of the respective Owners) in an agreement dated 2 August 2007 agreed to:

a)   Pay to ACM Shipping Ltd US$200,000 comprising; 1) US$81,900 by way of commission already invoiced by ACM Shipping for the period 2nd July 2003 to 26th October 2003 amounting to US$20,475 in respect of each vessel, and 2) US$118,100 in lieu of interest, and,

b)   Assign brokerage commission to ACM Shipping on their next intended time charter of the vessel "NS LION" valued at 1.25% on US$29,000 per day over 3 years (value US$132,312.50 per annum) and that if that charter was extended, NOUK agreed to arrange that ACM Shipping would be paid commission on such an extension. NOUK agreed to arrange that the value of such commission was guaranteed for the full period of 3 years (thus totalling US$396,937.50).

17(9).1.3    Further, NOUK incurred legal fees in investigating ACM Shipping Ltd's claims and negotiating the settlement of those claims. Such fees totalled £55,934.16.

17(9).2    Mr Mikhaylyuk is a constructive trustees of the 1.25 per cent address commissions deducted from the hire paid on each renewal and each of the 2005 Charters and is liable to account for and pay the same to Timashevsk Shipping, Taman Shipping, Tver Shipping and Troitsk Shipping and/or Timashevsk Shipping, Taman Shipping, Tver Shipping and Troitsk Shipping are entitled to recover such commissions on the grounds of unjust enrichment or as monies had and received.

18    Further, aAt the instigation of Mr Mikhaylyuk, in late 2003 and/or early 2004 Odin Marine, through Mr Per Tetzlaff and/or others, agreed and/or arranged with Stentex/Stena Bulk and/or others to make payments for the benefit of Mr Mikhaylyuk and/or others of whose identity NOUK is at present unaware in connection with the chartering to Stentex/Stena Bulk AB of the above vessels managed by NOUK. NOUK is unable prior to disclosure to give further particulars of the agreement or arrangements or of Mr Mikhaylyuk's instigation thereof, but will refer to the matters below.

19    Pursuant to and/or in furtherance of the agreement and/or arrangements Mr Mikhaylyuk provided Odin Marine with written details of the bank account to which such payments should be made. The bank account was in the name of Pulley Shipping. The details were as follows:

'US Dollars to The Bank of Nevis International Ltd, Nevis

| | |
|---|---|
| Pay: | Federal Reserve Bank |
| For Account: | The International Bank of Miami, NA |
| | 121 Alhambru Plaza-Penthouse 2 |
| | Coral Gables, Florida, 33134 |
| ABA No: | 0670-01699 |

Favour:         The Bank of Nevis International Ltd
                A/C #: 990000 420-06

Final credit to:   A/C Name:    Pulley Shipping Ltd
                   A/C #:       8292809'

These written details were signed by Mr Mikhaylyuk. As NOUK understands the position at present, the original written details were superseded (on a date which NOUK does not at present know) by the following written details:

'US Dollars to The Bank of Nevis International Ltd, Nevis

For Account: Union Planters Bank
2800 Ponce de Leon Boulevard, 8th Floor
Miami, Florida 33134
ABA No 0670-08414
Swift Code: UPNBUS44MIA
Favour: The Bank of Nevis International Ltd
A/C # 0902215221
Final credit to: Pulley Shipping Ltd
A/C #: 8292809'

Pulley Shipping is a company registered in the Island of Nevis. It was incorporated on 16 April 2004.

20    Mr Mikhaylyuk subsequently sent at least 22 written payment requests to Odin Marine amounting to at least US$1,211,183.07. Those requests of which NOUK is aware bear dates from 5 January 2004 to 20 January 2006. These payment requests were typewritten on NOUK's headed writing paper and were signed by Mr Mikhaylyuk. A schedule setting out the date and amount of each payment request is attached hereto as Schedule 1. So far as NOUK is aware, these payment requests were met by Odin Marine. At present, NOUK is aware of the following payments made by Odin Marine to Pulley Shipping's account at the Bank of Nevis:

| Date | Amount (US$) |
|------|------|
| 24 September 2004 | 59,019.66 |
| 30 September 2004 | 69,987.25 |
| 8 October 2004 | 83,468.84 |

| | |
|---|---|
| 7 January 2005 | 67,818.14 |
| 9 February 2005 | 78,395.57 |
| 2 March 2005 | 50,000.00 |
| 3 March 2005 | 87,817.53 |
| 11 March 2005 | 50,000.00 |
| 12 April 2005 | 46,131.35 |
| 13 May 2005 | 47,705.41 |
| 7 June 2005 | 45,453.13 |
| 13 July 2005 | 39,313.50 |
| 8 August 2005 | 42,133.48 |
| 13 September 2005 | 44,501.70 |
| 13 September 2005 | 49,025.02 |
| 10 October 2005 | 67,566.51 |
| 10 October 2005 | 48,850.83 |
| 6 January 2006 | 95,306.80 |
| 23 January 2006 | 127,395.58 |
| **Total:** | **1,199,890.30** |

21    The payments were arranged by Mr Mikhaylyuk and were made by Odin Marine as bribes and/or secret commissions or payments and Mr Mikhaylyuk dishonestly and in breach of his duties pleaded above and in breach of his contract of employment solicited and received or diverted such payments for the benefit of himself and/or others whom NOUK is at present unable to identify and concealed such payments from NOUK. Prior to disclosure, NOUK will refer to the following:

21.1    NOUK was at all material times unaware of the agreement and/or arrangements or the payments and at no time authorised the arrangements or the payments.

21.2    No copies of the payment requests, or any other records evidencing the payment requests or any payments, have been found on NOUK's files or on the files of NSC. No contractual or other documentation has been found on NOUK's files which explains, justifies or refers to the payments. Nor have the payments been accounted for to NOUK as would have occurred if the payment requests had been legitimate and/or authorised by NOUK.

21.3  None of the payment requests refers to any charterparty or other agreement and none bears any other reference such as would have been the case in respect of a legitimate payment request.

21.4  Further, there was no reason for a charterer's broker to make a payment of any fee or commission at the direction of the ship's operators.

21.5  Pulley Shipping performed no service in return for the payments. Further, as pleaded above, Pulley Shipping was not incorporated until 16 April 2004, some 3 months after the date of the first payment request.

21.6  As pleaded in paragraph 12 above, it is to be inferred that both Pulley Shipping and Mirador Shipping are controlled by Mr Mikhaylyuk and that the receipt by them of monies represented receipt by Mr Mikhaylyuk and/or by others and not for the benefit of NOUK. NOUK will further rely, in this regard on the facts and matters pleaded in paragraphs 22 to 22(25) below.

22    Further, in support of its contentions that Mr Mikhaylyuk controlled Mirador Shipping and Pulley Shipping and that the receipt by them of monies represented receipt by Mr Mikhaylyuk and/or by others, NOUK the Claimants will rely upon the facts and matters set out in the following sub-paragraphs 22(1) to 22(25).

22(1)  Mirador Shipping was incorporated under the provisions of the Nevis Business Corporation Ordinance 1984, as amended, on 3 December 2002. The incorporator was Mr Chris Morton ('Mr Morton'), of Morton House, Government Road, Charlestown, Nevis. On the same day, Mirador Shipping designated Hamilton Trust Company (Nevis) Limited ('Hamilton Trust') as its Registered Agent and Hamilton Trust, acting by Mr Morton, accepted such designation.

22(2) Minutes of a meeting of the Board of Directors of Mirador Shipping dated 6 January 2003 record a resolution that banking facilities be arranged with The Bank of Nevis International Limited ('the Bank of Nevis') and that the signing powers on the accounts be the Authorised Signatories of Hamilton Trust. Mr Morton signed these Minutes. The authorised signatories, as stated in a letter from Hamilton Trust dated 6 January 2003, were Mr Morton and Mr Ian Pinniger. Mr Pinniger is the founder of Hamilton Trust and was (until July 2007) a Director and shareholder of Fiduciary Management Limited of Third Floor, Mielles House, La Rue des Mielles, St Helier, Jersey, JE2 3QD, Channel Islands ('Fiduciary Management', as to which, see paragraph 22(9) below).

22(3) A Bank of Nevis 'Account Opening Fact Sheet', signed by Mr Morton, recorded that the Beneficial Owner of Mirador Shipping was Mr Maxim Androsov ('Mr Androsov'). Mr Androsov was (and is) a Russian citizen and a director of Navitank AB ('Navitank'), shipbrokers, of The White House, Bromma, Sweden. As appears below, Mr Androsov was a friend and business associate of Mr Mikhaylyuk.

22(4) The Bank of Nevis opened an account for Mirador Shipping on 4 March 2003 with the account number 8291982.

22(5) As pleaded above, from May 2004 to September 2005, Mirador Shipping's bank account with the Bank of Nevis was credited with payments which Mr Mikhaylyuk had dishonestly diverted from NOUK (see paragraph 11).

22(6) As pleaded below, on 19 July 2004, US$80,000 was transferred from Mirador Shipping's bank account with the Bank of Nevis to Pulley Shipping's recently opened bank account with the Bank of Nevis (see paragraph 22(14)).

22(7) When the present proceedings were commenced on 4 December 2006, the balance on Mirador Shipping's account with the Bank of Nevis was US$150,821.23. On 29 January 2007, US$130,000.00 was transferred from Mirador Shipping's Bank of Nevis

account to the account of Rowan Shipping Limited ('Rowan Shipping') at Investec Bank (Channel Islands) Limited, La Vielle Cour, St Peter Port, Guernsey, GY1 1WG, Channel Islands ('Investec Bank'). On 2 April 2007, US$7,412.70 was transferred from Mirador Shipping's Bank of Nevis account to Hamilton Trust Company (Nevis) Limited's account at Investec Bank and US$28,317.33 was transferred to Rowan Shipping's account at Investec Bank and the Bank of Nevis account was closed. As appears below (paragraph 22(21)), Investec Bank is also used by Pulley Shipping.

22(8) Rowan Shipping was incorporated on 10 June 2005 under the provisions of the Nevis Business Corporation Ordinance 1984, as amended. Its incorporator was Mr Morton and its Registered Agent is Hamilton Trust.

22(9) Pulley Shipping was incorporated on 16 April 2004 under the provisions of the Nevis Business Corporation Ordinance 1984, as amended. The circumstances of Pulley Shipping's incorporation, so far as known to the Claimants at present, included the following:

22(9).1 On or about 31 January 2003 Mr Mikhaylyuk consulted Mrs Jill R Tausney, a senior administrator with Fiduciary Management ~~Limited of La Blanche Pierre, Rue de la Blanche Pierre, Trinity, Jersey, JE3 5HG, Channel Islands ('Fiduciary Management')~~, in connection with the establishing of an offshore bank account, a Jersey trust and a Nevis company. In this regard, NOUK will refer to an e-mail from Mrs Tausney to Mr Mikhaylyuk dated 31 January 2003 which stated, in material part, the following:

> 'Thank you for your telephone call and email yesterday and I note that you have been referred to us by Dmitri.
> 'Our company provides a comprehensive range of trust and corporate services and once a suitable structure has been established we can establish an offshore bank account. A trust can be created to protect the assets of the company and any other assets you may wish to introduce to the trust *ie*, portfolio of shares, interests in other companies, *etc.* I enclose an information sheet on trusts for your reference.

'To enable us to proceed further you will need to take professional tax advice and provided details of the purpose of the structure. If you did not have a legal adviser then I suggest that you contact Mr Charles Pike of Withers law firm situated at 16 Old Bailey, London EC4M 7EG—Tel: 020 7597 6000—Fax: 020 7597 6543.

'In order to comply with the regulations we are required to hold the following documents before we proceed with the establishment of the structure(s), which I now enclose for your reference:

- Trust questionnaire
- Company questionnaire
- Management Services Agreement, this incorporates our terms and conditions

(If you establish a trust you will not need to complete the company questionnaire)

'In addition to this we will also require the following:

- Certified true copy of your passport
- Two original utility bills confirming your residential address
- A letter of introduction from a professional firm who has known you for more than three years.  A lawyer, bank or chartered accountant may provide this.

'I enclose a copy of our corporate profile, however for your ease of reference I detail below our fees in relation to the establishment of a Jersey Trust and a Nevis Company . . . .'

As regards this e-mail:

22(9).1.1    NOUK the Claimants does not have a copy of this email but has retrieved the above text has been retrieved as a data fragment from one of the laptop computers owned by NOUK and used by Mr Mikhaylyuk during his employment.

22(9).1.2    NOUK the Claimants does not have a copy of Mr Mikhaylyuk's e-mail of 30 January 2003 referred to in Mrs Tausney's e-mail;